THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM CLARKE, Defendant-Appellant.

First District (3rd Division)   No. 1—07—0688

Opinion filed May 27, 2009.

---

Kathleen T. Zellner & Associates, of Oak Brook (Douglas H. Johnson and Nicholas M. Curran, of counsel), for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Miles J. Keleher, and Douglas P. Harvath, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant was convicted of the first degree murder of Victor Pineda and sentenced to 65 years in prison. On ap-

peal, defendant contends that: (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt where neither defendant's confession nor the eyewitness's pretrial identification of defendant was credible; (2) trial counsel was ineffective by failing to offer evidence to corroborate defendant's claim of police abuse at the hearing on the motion to quash his arrest and suppress his statement; (3) trial counsel was ineffective by failing to submit a missing evidence instruction to the jury; (4) trial counsel was ineffective by opening the door to the admission of polygraph evidence; and (5) he was denied a fair trial where evidence of his polygraph examination was admitted into evidence and where no limiting instruction was provided. For the following reasons, we affirm.

## I. BACKGROUND

### A. Pretrial Motions

Prior to trial, defendant filed a motion to quash his arrest and suppress his statements. At the hearing on defendant's motion, Detective Greg Swiderek testified that on October 24, 2003, he was assigned to assist Detective James Gillespie in the investigation of the homicide of Victor Pineda, which occurred at 2714 West Haddon Avenue, in Chicago. After visiting the crime scene, Detective Swiderek interviewed Jose Santos, a Spanish Cobra gang member. Santos informed Detective Swiderek that Anthony Chico, also a Spanish Cobra, had chased after the individual who shot Pineda and exchanged gunshots with that individual.

On November 18, 2003, Detective Swiderek testified that police officers located Anthony Chico and brought him to the police station, where Detective Swiderek interviewed him. Chico stated that the individual who shot Pineda ran westbound in the alley off Haddon Avenue and that Chico retrieved a gun from Santos and ran across the street in an attempt to catch the shooter. Chico stated that he encountered the shooter in the alley and exchanged gunfire with him. Detective Swiderek testified that he showed Chico a photographic array and Chico identified defendant as the shooter. Chico also provided a handwritten statement to an assistant State's Attorney and Chico was not charged with an offense for his involvement in this case.

Based on this information, Detective Swiderek testified that on November 20, 2003, at about 6:45 p.m., he placed defendant under arrest. Detective Swiderek testified that he advised defendant of his *Miranda* rights, which defendant indicated he understood, and transported defendant to the police station. At about 8 p.m., Detective Swiderek testified that he readvised defendant of his *Miranda* rights and Detectives Swiderek and Gillespie attempted to speak to defendant

about the investigation. Defendant did not make any inculpatory statements at that time.

Detective Swiderek testified that at about 11:25 p.m., defendant was placed in a police lineup, where he was positively identified by Chico as the shooter and the person with whom Chico had exchanged gunfire. Detective Swiderek testified that photographs of the lineup were taken. Detective Swiderek testified that at about 1 a.m., on November 21, 2003, he and Detective Gillespie went back into the interview room with defendant. Detective Swiderek readvised defendant of his *Miranda* rights and told defendant that he had been identified as the shooter. Defendant admitted that he associated with the Maniac Latin Disciples and that he was present on October 17, 2003, when Jesus Feliciano, a Latin Jiver gang member, was murdered. Detective Swiderek testified that police officers believed that Pineda's murder was committed in retaliation for Feliciano's murder.

Detective Swiderek testified that defendant was not handcuffed while in the interview room and that the detectives left defendant in the room while they looked for additional witnesses. Detective Swiderek testified that at about 4 a.m., he and Detective Gillespie returned to the interview room and asked defendant if he would submit to a polygraph examination. Defendant agreed and participated in a polygraph examination at about 10 a.m. After the polygraph was completed, defendant was informed that he had been deceptive during the examination. At about 12 p.m., Detectives Swiderek and Gillespie returned to the interview room and readvised defendant of his *Miranda* rights. Defendant then had a conversation with the detectives and inculpated himself in Pineda's murder. Detective Swiderek testified that he contacted the State's Attorney's office, and at about 5:30 p.m., Assistant State's Attorney (ASA) Papa arrived at the police station. After meeting with ASA Papa alone, at about 9:30 p.m., defendant provided a videotaped statement.

Detective Swiderek denied that he ever beat defendant or that anyone in his presence threatened or mistreated defendant. Detective Swiderek testified that neither he nor Detective Gillespie ever went into the interview room without the other. Detective Swiderek testified that he never heard an individual, who appeared to be of Latino descent, tell defendant that the individual was "the captain of the State's Attorney" and that none of the officers working on the investigation were Latinos. Detective Swiderek testified that none of the detectives ever told defendant what to say or advised defendant that they would work with him so that defendant did not look like a "cold-blooded killer."

Detective Swiderek denied that defendant was ever handcuffed behind his back to a wall and stated that defendant never asked for an attorney. Detective Swiderek testified that defendant was provided with food and drinks and was allowed to use the restroom. Detective Swiderek denied that he only offered defendant food and drinks if defendant agreed to give a videotaped statement. Detective Swiderek also denied that he punched defendant in the face or that defendant used his white long-sleeve T-shirt to wipe blood off of his face.

During cross-examination, Detective Swiderek testified that he did not have a warrant for defendant's arrest at the time defendant was placed in custody. Detective Swiderek testified that when he located defendant, defendant did not run away. Detective Swiderek testified that defendant resembled the photograph that Chico had picked out from the photo array and the detective testified that he was not sure if the photograph was over three years old. Detective Swiderek testified that at the time he interviewed Chico, he was not aware that Chico was a member of the Spanish Cobra gang or that Chico was on parole for a drug-related case.

Detective Swiderek testified that until defendant's arrest, the description of the shooter was of a man about 5 feet 8 inches tall with a medium build and that defendant was 6 feet tall and 200 pounds. Detective Swiderek testified that defendant was placed in an interview room that had a stainless steel bench, where defendant spent the night. Defendant was not provided with a blanket or pillow and the lights were not turned off. Detective Swiderek testified that in the photo of the police lineup, defendant was wearing a white, long-sleeve T-shirt under a jersey, but he was not wearing the long-sleeve T-shirt in his videotaped statement. Detective Swiderek also testified that defendant provided the videotaped statement about 27 hours after he was taken into custody.

Detective James Gillespie testified consistently with Detective Swiderek with respect to the investigation and defendant's arrest. Detective Gillespie testified that he never spoke with defendant alone and that neither he nor anyone else beat defendant while defendant was in custody. Detective Gillespie testified that no one told defendant that he was the "captain of the State's Attorney" or that defendant better cooperate or they would "make [his] life a living hell." Detective Gillespie also denied that anyone told defendant what to say or that they would work with the State's Attorney so that defendant did not look like a "cold-blooded killer." Detective Adrian Garcia also testified that he never spoke to or threatened defendant.

Defendant testified that on the date of his arrest, he asked the police officers why he was being arrested and Detective Swiderek told

him, "We are doing the talking. You will find out when we get to the station." Defendant testified that the officers never advised him of his *Miranda* rights.

Defendant testified that when he and the police officers arrived at the police station, defendant was handcuffed to a ring on the wall so that both hands were behind his back. Defendant testified that there was nothing for him to sit on in the interview room and that he stood the entire time. Defendant testified that the first time Detectives Swiderek and Gillespie attempted to speak with him, defendant asked for an attorney. The detectives told defendant, "There is no attorney here. You can't call anybody." Defendant testified that he denied any involvement in Pineda's shooting and the detectives left the room. Defendant testified that Detectives Swiderek and Gillespie returned to the interview room on numerous occasions over a 27-hour period and asked him questions about the shooting in an attempt to force defendant to confess to the crime. Defendant testified that he remained handcuffed to the wall the entire time and that he was deprived of food, drink, sleep and the use of a bathroom.

Defendant testified that the detectives informed him that he would participate in a police lineup. Defendant identified a photo from the lineup in which he was wearing a white, long-sleeve T-shirt under a jersey. Defendant testified that after the lineup, he was taken back to the interrogation room and handcuffed to the ring on the wall.

Defendant testified that after the detectives engaged in several rounds of questioning him, Detective Swiderek became aggravated and struck defendant in the chest and back. After a few more rounds of questioning, defendant testified that Detective Swiderek punched him in the chest, back, and mouth. Defendant testified that he was unable to avoid the punches because he was handcuffed behind his back to the wall. Defendant testified that his lip was cut and he began bleeding onto his white T-shirt and the floor. Defendant testified that the detectives took his T-shirt from him because it had blood on the collar.

Defendant testified that the detectives entered the room and interrogated him several more times for about 30 to 45 minutes each time. Defendant finally agreed to submit to a polygraph examination. Following the polygraph, defendant was taken back to the interrogation room. Detective Swiderek informed defendant that he had failed the polygraph and told him that he should admit to the crime. Defendant testified that after he denied involvement, Detective Swiderek punched and kicked him in the side of his back, near his ribs. Defendant testified that Detective Swiderek told him, "Admit to the crime. We are going to help you. We are going to make it look like you are not a cold-

blooded murderer. We are going to make it look like it was an accident." Defendant testified that a Latino detective came into the interview room and told defendant that he was "the captain of the State's Attorney's Office" and that if defendant would confess, the detective would "make it look like [he was] not a cold blooded-murderer" and that it was an accident.

Defendant testified that he had still been deprived of food and drink and told the detectives that he would do whatever they wanted because he did not want to get hit anymore. Defendant testified that the detectives uncuffed one of his arms, brought in a chair, and told defendant how the crime happened and what to say to the ASA. Defendant testified that he told the ASA that he had been treated well by police officers because he was afraid of reprisal from Detective Swiderek.

In rebuttal, ASA James Papa testified that he interviewed defendant on November 21, 2003, at about 6:30 p.m. ASA Papa testified that he advised defendant of his *Miranda* rights, which defendant indicated he understood. ASA Papa testified that he spoke with defendant for about 30 minutes and defendant made an inculpatory statement. ASA Papa testified that defendant had no injuries and defendant was not in handcuffs during the interview. Defendant stated that he had been treated "well" by the police officers and that no threats or promises had been made to him. Defendant told ASA Papa that he had been given drinks and food and was allowed to use the bathroom and sleep. Defendant never stated that he was deprived of sleep, beaten, or handcuffed the entire time he was in custody. ASA Papa testified that he did not tell defendant what to say during the videotaped statement.

Detective Swiderek was also recalled and testified that while defendant was in the interview room, defendant took off his shirt because he was hot. Detective Swiderek found the shirt on the floor and placed it with the rest of defendant's clothing, including his jacket. Detective Swiderek testified that the shirt did not have any blood on it.

Following this testimony, the circuit court denied defendant's motion to quash his arrest and suppress his statements. In doing so, the court determined that the information supplied by Chico was credible and provided probable cause to arrest defendant. With respect to defendant's motion to suppress his statements, the court found that defendant failed to corroborate his claims of physical abuse and that the State disproved each allegation "beyond a preponderance of the evidence." The court concluded that defendant's will was not "overborne either by the police or the [S]tate's [A]ttorney. That his statement was voluntarily made."

Prior to trial, defendant also filed a motion *in limine* seeking to bar the State from presenting any evidence related to defendant's submission to the polygraph examination. The State indicated that it had no intention of presenting evidence of the polygraph examination unless defendant introduced evidence that his confession was coerced. If defendant did so, the State reserved the right to introduce evidence that defendant provided a voluntary inculpatory statement after being confronted with the results of his polygraph. The circuit court held that the State would be allowed to present evidence that defendant was confronted with the results of "additional forensic testing" to rebut any claims defendant may present that his statement was coerced or in any way involuntary. After denying defendant's motion to reconsider, the circuit court clarified that "under no condition would [the State] be allowed to bring in the results [of the polygraph]."

Prior to trial, defendant's attorney also obtained an order allowing him to inspect clothing that defendant had been wearing on the date of his arrest. The record does not contain any further information regarding defense counsel's inspection of defendant's clothing, including the condition of the long-sleeve white T-shirt that defendant was wearing while he was in police custody.

## B. Trial Testimony

At trial, Anthony Chico testified that on October 24, 2003, he was a member of the Spanish Cobras gang. Chico testified that he had previous convictions for possession of a controlled substance with intent to deliver and residential burglary. On the date in question, Chico was on the 2700 block of Haddon Avenue with Pineda and Santos. Chico testified that Santos was working on his car at the time. Chico testified that he received word that the "opposition" was on the next block, meaning a rival gang member. Chico testified that he thought that the "opposition" was an individual named Alex, who was a Maniac Latin Disciple. Chico asked Pineda and Santos if they had "security," and after they indicated that they did not, Chico retrieved a handgun from inside of Santos' house.

Chico testified that at about 4 p.m., he heard five to seven gunshots from behind him and ducked down on the ground. After the gunshots stopped, Chico saw the back of a person, who was wearing a "hoodie," running away. Chico chased the shooter into a gangway between two houses toward an alley and shot at the individual as he was running. The individual then turned in Chico's direction and returned gunfire. Chico testified that he was about 10 to 15 feet away from the individual and that he only caught a glimpse of the individual's face, whom he did not recognize. After Chico ran out of bullets, he ran back to Haddon Avenue.

Chico testified that on November 18, 2003, police officers took him to the police station and showed him six photographs. Chico recognized one of the photographs as Alex, the Maniac Latin Disciple that he thought was in the area right before the shooting, but Chico told the police officers that Alex was not the shooter. Chico testified that he identified a photo of defendant as a person who resembled the shooter, but he did not make a positive identification. Chico testified that after police officers slapped and punched him and stomped on his feet, Chico identified defendant as the shooter. Chico testified that on November 19, 2003, he told ASA Bill Merritt that defendant was the shooter. Chico also told ASA Merritt that he had not been physically mistreated by the police and Chico signed a written statement identifying defendant as the shooter.

Chico testified that he was no longer a member of the Spanish Cobras, but joined the Gangster Disciples. Chico testified that the Spanish Cobras and Gangster Disciples were getting along at the moment, but the Gangster Disciples were not getting along with the Maniac Latin Disciples.

On cross-examination, Chico testified that defendant was not the shooter. Chico testified that he had been on parole for about five months at the time of the shooting and that it would have been a violation of his parole to have a gun or associate with gang members. Chico testified that he was in police custody for over 24 hours before he gave a written statement, and at the time he identified defendant in the lineup, he thought the police still had the ability to charge him with violating his parole.

Jose Santos testified that on October 24, 2003, he was in front of his house, located at 2716 West Haddon Avenue, fixing his vehicle. Santos testified that Chico and Pineda were with him and that he and Pineda were Spanish Cobra members. Santos testified that at about 4 p.m., he heard gunshots coming from the south side of the street. Santos dropped to the ground and did not see the shooter. Santos handed Chico a gun and Chico chased after the shooter. Santos testified that after he lost sight of Chico, he heard more gunshots, which sounded like they came from different guns. Chico returned and handed the gun back to Santos. Santos testified that he called a friend who disposed of the gun.

Joel Brown testified that at the time of the shooting, he was inside his first-floor apartment at 2707 West Haddon Avenue. Brown heard gunshots and when he looked out of his window, he saw a man standing on his front steps firing a black gun across the street. Brown testified that the shooter was wearing a light-colored hooded sweatshirt and dark baggy jeans. Brown heard five to seven gunshots, then he

heard additional gunfire from a distance. Brown testified that he was unable to see the shooter's face, but he called the police to report what he witnessed.

Maritza Vazquez testified that at the time of the shooting, she was seated in her car on Haddon Avenue when she heard gunshots from across the street. After she heard gunshots, Vazquez looked up and saw a man wearing a hooded sweatshirt firing a gun. The man was standing across the street and pointing the gun toward her side of the street. The shooter then ran across the street and fled through a gangway. Vazquez testified that she later told ASA Papa that the shooter was wearing a brown and orange hoodie and fired a black gun. Vasquez also told ASA Papa that she saw another man firing a gun as he ran toward the same alley as the shooter.

Martha Nieves testified that at the time of the shooting, she was inside of her house at 2708 West Haddon Avenue. Nieves heard gunshots and ran into the living room to move her disabled sister away from the front window. Nieves testified that she saw a man standing in front of the apartment building at 2707 West Haddon Avenue. The man was wearing a beige hooded sweatshirt and blue jeans. Nieves testified that she saw the man jump over a fence into an adjacent yard, then saw Chico chase after the man. Nieves saw the victim lying on the ground, so she ran outside and saw that the victim had a gunshot wound to his head.

Forensic investigator William Sullivan testified that he processed the crime scene on the 2700 block of West Haddon Avenue. Investigator Sullivan testified that the police recovered eight 9-millimeter casings from the scene, six of which were recovered from in front of 2707 West Haddon Avenue and two of which were recovered from the alley of 2711 West Haddon Avenue. Investigator Sullivan testified that forensic testing on the casings did not reveal any fingerprints suitable for comparison.

Marc Pomerance testified that he is employed as a forensic scientist specializing in firearms and tool mark examinations for the Illinois State Police Forensic Science Center. Pomerance testified that based on his examination, he determined that all eight fired cartridge cases were fired from the same firearm.

Detective Swiderek testified consistently with his pretrial testimony. Detective Swiderek testified that prior to showing Chico the six photographs, Chico stated that he saw the shooter in the area before and thought that he could identify the shooter. Detective Swiderek testified that Chico positively identified defendant from the photographs as the shooter. Detective Swiderek testified that Chico did not tell anyone in his presence that he was unsure of his identifica-

tion of defendant as the shooter. Detective Swiderek also testified that no one threatened or physically abused Chico in his presence.

ASA William Merritt testified that on the evening of November 19, 2003, he interviewed Chico at the police station. Chico was in an interview room and not handcuffed. ASA Merritt testified that Chico told him that he saw the shooter and chased him into an alley on Haddon Avenue. Chico stated that he exchanged gunfire with the shooter from about 10 or 12 feet away and had a clear and positive view of the shooter. ASA Merritt testified that Chico stated that he identified the shooter from a group of photographs and that he was positive about his identification of the shooter. ASA Merritt testified that he spoke with Chico alone and that Chico indicated that he had been well treated by the police. Chico stated that the police officers gave him food and water, and he had no complaints. ASA Merritt testified that Chico was calm and relaxed and stated that he had not been threatened or promised anything in exchange for providing a statement. Chico then provided ASA Merritt with a handwritten statement. ASA Merritt acknowledged that possessing a firearm on the streets of Chicago in October 2003 was a felony, but he did not approve charges against Chico. ASA Merritt testified that his office did not normally charge witnesses in homicides for such violations when they are trying to pursue an individual who committed murder.

ASA James Papa testified consistently with his pretrial testimony. ASA Papa testified that when he interviewed defendant on November 21, 2003, he advised defendant of his *Miranda* rights, defendant indicated that he understood his rights, and defendant agreed to provide a videotaped statement. ASA Papa testified that defendant indicated that he had been treated "fine" and had no complaints about the police officers. Defendant's videotaped statement was then published to the jury.

After the State rested its case, the circuit court denied defendant's motion for a directed verdict. Carmen Romero testified on defendant's behalf. Romero testified that on the date of the shooting, she was walking home through the alley when she heard gunshots. Romero saw a man jump over a fence about 20 feet away from her. Romero testified that the man was wearing a black hoodie with the hood up. Romero did not see the man's face, but noticed a mark similar to a tattoo on the right side of his neck. Romero testified that she was shocked, bent her head down and did not see where the man went.

Defendant testified that he was not involved in the shooting that took place on October 24, 2003. Defendant testified that on that date, he had an appointment at a clinic one block from the shooting, but he could not remember the exact time of his appointment. Defendant

testified that he did not have a desire to avenge Feliciano's murder. Defendant testified that he does not have a tattoo on either side of his neck.

Defendant testified to the facts elicited from him during the motion to quash his arrest and suppress his statements. Defendant also testified that while he was in police custody, he was handcuffed so tightly that he had marks on his wrists. Defense counsel then introduced photographs of defendant taken on November 24, 2003, of defendant's wrists and body. Defendant testified that the photographs were taken three days after he provided his statement, and the marks had faded during that time. Defendant also introduced a photograph showing a cut on his lip that was taken November 24, 2003.

Defendant then testified with respect to the polygraph test, as follows:

"DEFENSE COUNSEL: How much time went by before you saw [Detectives] Swiderek and Gillespie again?

MR. CLARKE: Maybe another 30, 45 minutes.

DEFENSE COUNSEL: Anybody hit you when they came in this time?

MR. CLARKE: No, sir.

DEFENSE COUNSEL: What was [Detective] Swiderek's demeanor this trip?

MR. CLARKE: Still angry and aggressive.

DEFENSE COUNSEL: How long were they in the room that time?

MR. CLARKE: Maybe 25 to 30 minutes.

DEFENSE COUNSEL: Did they talk about anything different, bring up any different subjects this time at all?

MR. CLARKE: Yeah. This time he came in, he asked me if I would be willing to do a polygraph test. I told him sure, I have nothing to hide, I will take a polygraph test.

DEFENSE COUNSEL: Did you eventually sit for a polygraph test?

MR. CLARKE: Yes.

DEFENSE COUNSEL: How soon after you said that, sure, I'll sit—I have nothing to hide, I'll sit for one did [Detectives] Swiderek and Gillespie leave the room?

MR. CLARKE: Maybe another 15, 20 minutes.

DEFENSE COUNSEL: Did [Detective] Swiderek hit you at all in that session?

MR. CLARKE: No, he didn't hit me, but he uncuffed me from the ring in the wall and he took my shirt off.

DEFENSE COUNSEL: Did he uncuff you before or after you agreed to the polygraph?

MR. CLARKE: After.

* * *

DEFENSE COUNSEL: Now, you say you eventually did see a polygraph operator. Did [Detectives] Swiderek and Gillespie come back at all between when he left with the T-shirt and when you actually went to the polygraph?

MR. CLARKE: Yeah, he came back and told me that the polygrapher would be a while and that they'll come get me when it was time to take the polygraph test."

The circuit court called a sidebar and asked defense counsel, "Why is the word 'polygraph' coming out ***?" Defense counsel responded, "Just to show a time line." The circuit court cautioned defense counsel against using the word "polygraph" any further.

Prior to defendant's cross-examination, the circuit court noted that defendant had violated the motion *in limine* by testifying about the "polygraph." The circuit court determined that where defendant had introduced evidence that his confession was coerced, the State would be allowed to rebut his claim with evidence that defendant confessed after being confronted with the results of the polygraph examination. The circuit court held that since defendant had already used the word "polygraph," the term "additional forensic testing" would not be used because it might mislead the jury to believe that some other test in addition to the polygraph test was performed.

During cross-examination, defendant testified that he never told ASA Papa that the detectives had beaten and threatened him or that he was refused his request for an attorney. Defendant denied that he confessed to the shooting only after the detectives "confronted [him] with the results of the polygraph examination that [defendant] had agreed to take." Defendant testified that he was not advised of his rights until he provided the videotaped statement. Defendant also testified that Detective Swiderek struck him after confronting defendant with the results of the polygraph examination.

In rebuttal, ASA Papa testified that defendant was advised of his rights, defendant never complained of mistreatment by the police, defendant never requested an attorney, and defendant was not bleeding and did not have a swollen lip. Detective Gillespie and Detective Swiderek both testified that defendant was never punched in the face, back or chest in their presence. Detective Gillespie also testified that defendant agreed to take a polygraph examination, and after the detectives confronted defendant with the results, defendant confessed to shooting Pineda.

Following closing arguments, the jury found defendant guilty of first degree murder and defendant was sentenced to 65 years in prison.

The circuit court denied defendant's motion for a new trial. Defendant now appeals.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant first contends that he was not proved guilty beyond a reasonable doubt because the identification testimony against him was insufficient to allow a reasonable trier of fact to find him guilty of the first degree murder of Pineda.

When reviewing the sufficiency of the evidence, it is necessary to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Magee*, 374 Ill. App. 3d 1024, 1031 (2007), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is not the function of the reviewing court to retry the defendant or substitute its judgment for that of the trier of fact. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Rather, the trier of fact assesses the credibility of the witnesses, determines the appropriate weight of the testimony and resolves conflicts or inconsistencies in the evidence. *Evans*, 209 Ill. 2d at 211. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Wesley*, 382 Ill. App. 3d 588, 590 (2008).

■ We find that, contrary to defendant's assertion, the lack of physical evidence in this case does not render the jury's finding unsatisfactory, improbable or implausible, where an eyewitness positively identified defendant as the shooter in both a photographic array and a physical lineup, and defendant gave a videotaped confession. Identification by a single witness is sufficient to support a conviction if the defendant is viewed under circumstances permitting a positive identification. *Magee*, 374 Ill. App. 3d at 1032. The factors to be considered in evaluating the reliability of identification testimony are: (1) the witness's opportunity to view the defendant during the offense; (2) the witness's degree of attention at the time of the offense; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification. *Magee*, 374 Ill. App. 3d at 1032, citing *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972).

In the instant case, review of the record demonstrates that Chico provided reliable pretrial identifications of defendant as the shooter. Within a month of the shooting, on November 18, 2003, Chico was

interviewed by Detective Swiderek. Chico stated that the individual who shot Pineda ran westbound in the alley of Haddon, and that Chico retrieved a gun from Santos and ran across the street in an attempt to catch the shooter. Chico stated that he encountered the shooter in the alley and exchanged gunfire with him. Chico then identified defendant as the shooter from a photographic array. Two days later, on November 20, 2003, defendant was placed in a police lineup, where he was positively identified by Chico as the shooter and the person with whom Chico had exchanged gunfire. Chico's identification and description of the events surrounding the shooting were corroborated by other witnesses. Santos testified consistently regarding the events prior to the shooting and that Chico pursued the shooter with a handgun that Santos provided. Nieves and Brown corroborated circumstances surrounding the shooting, including where the shooter was standing, what he was wearing, and the direction in which the shooter fled. Detective Swiderek testified that prior to being shown the six photographs, Chico stated that he had seen the shooter in the area before and thought that he could identify the shooter. Furthermore, Chico's identification of defendant as the shooter was also corroborated by defendant's videotaped confession detailing his involvement in the shooting death of Pineda. The jury had the opportunity to hear the testimony regarding defendant's identification and determine the witnesses' credibility. In light of the foregoing, we find that the evidence presented was sufficient to prove beyond a reasonable doubt that defendant was the perpetrator of the charged murder.

Defendant asserts that Chico's identification of the shooter was undermined by Romero's testimony that the shooter had a neck tattoo because defendant does not have such a tattoo. However, our supreme court has determined that " '[t]he presence of discrepancies or omissions in a witness' description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made.' " *Magee*, 374 Ill. App. 3d at 1032, quoting *People v. Slim*, 127 Ill. 2d 302, 309 (1989). Moreover, Romero testified that she did not see the shooter's face and that she bent her head down after seeing the shooter.

Defendant also argues that Chico's pretrial identification of defendant was insufficient to support a conviction where Chico recanted on the stand and testified that he was coerced into identifying defendant in order to avoid charges against him for violating his parole, and where no physical or other corroborating evidence connected defendant to the crime. In support of this argument, defendant relies on *People v. Brown*, 303 Ill. App. 3d 949 (1999). In *Brown*, the defendant was charged with a shooting. The only evidence linking the

defendant to the crime was a statement made by a witness two years after the crime, and that statement was disavowed by the witness at the defendant's trial. *Brown*, 303 Ill. App. 3d at 965. In *Brown*, this court determined that because the witness's prior statement implicating the defendant was uncorroborated and was not made contemporaneously with the crime, it was insufficient as proof beyond a reasonable doubt. *Brown*, 303 Ill. App. 3d at 965.

Defendant also cites *People v. Wise*, 205 Ill. App. 3d 1097 (1990), in support of his argument. In *Wise*, the single accusing witness never called the police and gave two recantations disavowing his earlier statement that defendant had robbed him. This court found that the witness's inconsistent statements, combined with the complete lack of corroborative evidence, rendered the witness's testimony insufficient to support the defendant's conviction. *Wise*, 205 Ill. App. 3d at 1101.

*Brown* and *Wise* are distinguishable from the present case. In the present case, Chico's recanted identification of defendant was not the sole evidence in the case, as in *Brown* and *Wise*. The State presented more evidence than just Chico's prior statements. Officers testified that the prior statements were given voluntarily and that no promises or threats were made to the witness. Detective Swiderek testified that prior to being shown the six photographs, Chico stated that he had seen the shooter in the area before and thought that he could identify the shooter. Detective Swiderek also testified that Chico positively identified defendant from the photographs as the shooter and that Chico did not tell anyone that he was unsure of his identification of defendant. Santos testified regarding the events prior to the shooting and that Chico pursued the shooter with a handgun that Santos provided. Nieves and Brown corroborated circumstances surrounding the shooting, including where the shooter was standing, what he was wearing, and the direction in which the shooter fled. This evidence could lead a rational jury to conclude that Chico told the truth when he implicated defendant in November 2003, but lied years later at defendant's trial in October 2006. See *People v. Thomas*, 354 Ill. App. 3d 868, 880-81 (2004) (accomplice's prior statement to an assistant State's Attorney and testimony at his own trial that implicated the defendant in the murder, which accomplice recanted at the defendant's trial, was properly admitted under section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 2002)) and sufficient to support the defendant's conviction for murder without the need for additional corroboration). We find nothing here to justify the substitution of this court's judgment for that of the jury in weighing Chico's statements. See *Evans*, 209 Ill. 2d at 209.

Defendant further argues that the evidence was insufficient to support his conviction where his videotaped confession was the product of police misconduct and abuse. While defendant testified that he was denied food, drink and access to an attorney, not allowed to use the washroom, handcuffed to a wall, and repeatedly struck by police, and he provided the videotaped statement almost 27 hours after his arrest, the jury was not required to accept defendant's testimony or version of events as true. *People v. Feyrer*, 269 Ill. App. 3d 734, 742-43 (1994). Rather, the jury assesses the credibility of the witnesses, determines the appropriate weight of the testimony and resolves conflicts or inconsistencies in the evidence. *Evans*, 209 Ill. 2d at 211. We therefore conclude that defendant's contention that he was not proven guilty beyond a reasonable doubt is without merit.

## B. Ineffective Assistance of Trial Counsel

### 1. *Suppression Hearing*

■ Defendant next contends that he was denied the effective assistance of counsel during the hearing on his motion to quash his arrest and suppress his statements. Defendant first claims that he was prejudiced by trial counsel's failure to call Chico to testify at the pretrial hearing where Chico testified at trial and indicated in a written statement to a private detective that his identification of defendant as the shooter was the product of police coercion.

In determining whether a defendant was denied the effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant argues that Chico's pretrial identification of defendant as the shooter was the sole basis for defendant's arrest. Defendant relies on Chico's statement to a private detective on December 5, 2003, and Chico's subsequent trial testimony recanting his identifica-

tion of defendant to suggest that trial counsel was ineffective for failing to call Chico to testify in support of defendant's motion to quash his arrest and suppress his evidence. However, a decision whether or not to call a particular witness about a particular subject is a matter of trial strategy, left to the discretion of trial counsel. *People v. Johnson*, 385 Ill. App. 3d 585, 601 (2008). This decision carries a strong presumption that it was the product of strategy rather than incompetence. *Johnson*, 385 Ill. App. 3d at 601. As a result, this type of decision is generally immune from claims of ineffective assistance of counsel. *Johnson*, 385 Ill. App. 3d at 601-02.

In addition, defendant's claim is based on speculation that Chico's testimony at the pretrial motion would have been consistent with his statement to the private detective and his trial testimony. The evidence presented at trial showed that Chico identified defendant as the shooter in November 2003, from both a photographic array and a physical lineup. At trial, in October 2006, Chico recanted his identification of defendant and testified that his identification was the product of police coercion. Chico also testified at trial that, after the time of the shooting, Chico had changed gang allegiance, which allied him with defendant. Defendant's argument presumes that Chico would have provided testimony at the hearing on defendant's pretrial motion that was similar to his subsequent trial testimony and that the circuit court would have found Chico's testimony credible. Our supreme court has noted that " '[a] defendant cannot rely on speculation or conjecture to justify his claim of incompetent representation.' " *People v. Deleon*, 227 Ill. 2d 322, 337 (2008), quoting *People v. Pecoraro*, 175 Ill. 2d 294, 324 (1997). Furthermore, defendant's reliance on Chico's trial testimony nearly three years after the shooting would require this court to assess trial counsel's strategy in hindsight. Our supreme court has cautioned that "such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002). Accordingly, we find that trial counsel's performance was not deficient on this basis.

Defendant next contends that trial counsel was ineffective during the hearing on his motion to quash his arrest and suppress his statements where counsel failed to offer evidence to corroborate defendant's claim that he was beaten prior to providing the videotaped statement. Specifically, defendant argues that trial counsel should have presented the photographs of defendant taken on November 24, 2003, four days after his arrest, depicting bruises to his wrists and side. Defendant also argues that trial counsel should have offered defendant's

"bloodstained" T-shirt into evidence or informed the circuit court that the white, long-sleeve T-shirt that defendant alleged had blood on it from beatings he received while in custody was missing from defendant's personal property.

When a defendant moves to suppress his confession, the State has the burden of establishing that the confession was voluntary. *People v. Woods*, 184 Ill. 2d 130, 145 (1998). A confession is voluntary when, based on the totality of the circumstances, the accused's will was not overborne at the time he confessed. *People v. Richardson*, 376 Ill. App. 3d 537, 541 (2007), *appeal granted*, 226 Ill. 2d 627 (2008). In determining the voluntariness of a confession, the court considers the totality of circumstances, including the defendant's age, intelligence, background, experience, mental capacity, education, physical condition and experience with the criminal justice system, the legality of the detention, the length of the detention, the duration of questioning and any promises, threats, deceit, and physical or mental abuse by police. *Richardson*, 376 Ill. App. 3d at 541. If, however, a defendant established that he was injured while in police custody, suggesting that the confession was involuntarily given, the State must show by clear and convincing evidence that the injuries were not inflicted as a means of obtaining the confession. *Richardson*, 376 Ill. App. 3d at 542.

At the pretrial hearing, the only evidence presented was testimony, thereby making the circuit court's determination one based on the witnesses' credibility. *People v. Hinton*, 302 Ill. App. 3d 614, 620 (1998), citing *People v. Wilson*, 116 Ill. 2d 29, 40 (1987) (if defendant's testimony is the only evidence that a confession was obtained through coercion and the State's witnesses testify otherwise, the circuit court is permitted to believe the State's witnesses over the defendant). Defendant contends that, had the photographs of his wrists and the bloodstained T-shirt been introduced as evidence of his injury, this evidence would have corroborated defendant's claim of physical abuse and the State's witnesses' denials of abuse would have been insufficient. Instead, clear and convincing evidence would have been necessary to show that defendant's injuries did not result as a means of procuring a confession. However, before the State's burden increases, defendant must "clearly establish" or make it "evident" that he received the injuries while in custody. *Hinton*, 302 Ill. App. 3d at 620, quoting *People v. Wilson*, 116 Ill. 2d 29, 40 (1987). Once defendant satisfies his burden, only then is the State required to show by clear and convincing evidence that the injuries occurred in order to produce a confession. *Woods*, 184 Ill. 2d at 148-49.

Even assuming that the photographs depicted injuries to defendant's wrists and body, it is not "clearly established" or "evident"

that defendant was injured while in police custody. Rather, as defendant notes, the photographs were not taken until three days after defendant's arrest when he was no longer in custody. We also note that the State's witnesses testified at the suppression hearing that defendant had no injuries at the time of his statement and that defendant stated that police treated him well, and the videotaped statement did not corroborate defendant's claims of physical injuries to his mouth.

With respect to defendant's long-sleeve T-shirt, the record is silent regarding the condition and whereabouts of that item. While defense counsel received permission to inspect defendant's clothing, the record does not contain any further information regarding the T-shirt. Taking as true defendant's allegation that there must have been blood on his missing T-shirt, the shirt is not evidence that defendant was injured while in police custody. In *Hinton*, 302 Ill. App. 3d at 620-21, this court rejected a similar argument. This court noted that "[a] bloodstained jersey is not a factual basis upon which to argue that defendant suffered bodily harm. Without evidence of any injury, the State is not required to present clear and convincing evidence." *Hinton*, 302 Ill. App. 3d at 621; see also *People v. Orange*, 168 Ill. 2d 138, 154 (1995) (counsel not ineffective where no factual basis existed for the motion as there was no evidence of defendant's purported injuries, the photographs did not show physical trauma, and witnesses testified that he was not harmed). Defendant has failed to establish that trial counsel was ineffective where defendant cannot show that there is a reasonable probability that the outcome of his trial would have been different had evidence of the photographs and T-shirt been presented at the suppression hearing.

### 2. Missing Evidence Jury Instruction

■ Defendant also contends that trial counsel was ineffective for failing to give a missing evidence instruction (Illinois Pattern Jury Instructions, Civil, No. 5.01 (1995) (hereinafter IPI Civil (1995) No. 5.01)) to the jury on the issue of defendant's long-sleeve T-shirt.

IPI Civil (1995) No. 5.01 provides the following:

"If a party to this case has failed [to offer evidence] [to produce a witness] within his power to produce, you may infer that the [evidence] [testimony of the witness] would be adverse to that party if you believe each of the following elements:

1. The [evidence] [witness] was under the control of the party and could have been produced by the exercise of reasonable diligence.

2. The [evidence] [witness] was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have [offered the evidence] [produced the witness] if he believed [it to be] [the testimony would be] favorable to him.

4. No reasonable excuse for the failure has been shown."

In this case, defense counsel's alleged failure to tender IPI Civil (1995) No. 5.01 did not cause his performance to fall below "prevailing professional norms." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. "Decisions concerning defense counsel's choice of jury instructions are characterized as tactical decisions within the judgment of defense counsel." *People v. Houston*, 363 Ill. App. 3d 567, 575 (2006). "Trial strategy cannot be a basis for finding counsel ineffective." *Houston*, 363 Ill. App. 3d at 575.

Here, the evidence showed that while defendant was in police custody, police officers placed the long-sleeve T-shirt that defendant had been wearing with his other clothing. The record shows that defense counsel obtained permission to inspect defendant's clothing, but the record is silent as to what defense counsel's inspection revealed. Defendant now argues that defense counsel should have presented IPI Civil (1995) No. 5.01 to support defendant's allegations of police abuse because the State would have produced the T-shirt if it did not have blood on it. However, defense counsel may not have wanted to draw attention to the fact that counsel was granted the opportunity to inspect defendant's clothing and raise an inference that counsel's inspection of the clothing did not support defendant's claims of abuse.

In *People v. Woods*, 292 Ill. App. 3d 172, 179-80 (1997) (Cook, J., dissenting), Justice Cook cautioned judges regarding the use of IPI Civil (1995) No. 5.01. Justice Cook stated that "[j]udges in civil cases should be reluctant to give a missing witness instruction" and "[i]n criminal cases judges must be even more careful." *Woods*, 292 Ill. App. 3d at 180 (Cook, J., dissenting). Justice Cook explained that "[t]here is no missing witness instruction in criminal cases, and comment on missing witnesses may violate (1) the defendant's right to remain silent and (2) the defendant's presumption of innocence, as it is impermissible for the prosecution to attempt to shift the burden of proof to the defendant." *Woods*, 292 Ill. App. 3d at 180 (Cook, J., dissenting).

In this case, had defense counsel tendered IPI Civil (1995) No. 5.01, the comments on the missing evidence may have violated defendant's presumption of innocence as Justice Cook warned. While defendant argues that this instruction would have supported defendant's claims of police abuse, the jury may have improperly

imposed a burden of proof on defendant to present evidence, including defense counsel's inspection of the T-shirt. It is impermissible for the prosecution to attempt to shift the burden of proof to the defense. The defense is under no obligation to present any evidence. *People v. Phillips*, 127 Ill. 2d 499, 527 (1989). We therefore cannot say that defense counsel's performance was deficient in this regard.

We further note that while defendant asserts that he was prejudiced by trial counsel's failure to tender IPI Civil (1995) No. 5.01, trial counsel presented arguments regarding the T-shirt. During closing argument, defense counsel stated:

> "We've got that long-sleeved T-shirt issue. Where is it? [Defendant] is wearing it when arrested. He's got a long sleeved white T-shirt on. You saw it in the lineup photos. White sleeve on each arm, white collar. Over that he's wearing a sleeveless jersey, a sports jersey. Very informal garment with the striping and the logos and the words and the number on it.
>
> If he gets warm in an interview room which one is he going to leave off? Which one is he going to take off and leave off? Especially knowing that he's going to be in a video. ***
>
> And why would he be warm? He's in an interview room which even if you believe the officers has a metal bench and that's it. He's in there overnight. He's not allowed to sleep even if he's not comfortable. ***
>
> No, it happened the way he said it happened. That T-shirt, that long-sleeved shirt, was taken from him because he bled out from his mouth from the blow inflicted by Detective Swiderek on to the shirt. ***
>
> *** It had blood on it. And where is it now? You talk about pieces of a puzzle, there's a big piece missing from the middle of this puzzle and that's the T-shirt. Physical evidence that does not lie.
>
> Whose explanation for where that T-shirt went and why it disappeared is more plausible?"

Accordingly, the record shows that defense counsel argued that the evidence regarding the T-shirt supported defendant's claims of police abuse without taking a chance that a missing evidence instruction would improperly shift the burden of proof to defendant.

## C. Evidence of Defendant's Polygraph Examination

Defendant next contends that he was denied a fair trial where evidence of his polygraph examination was not relevant to his claim that his confession was coerced; the results of the polygraph examination were improperly admitted; and the circuit court failed to issue a limiting jury instruction regarding the polygraph evidence.

Defendant asserts that, although he failed to preserve this issue for review by including it in his posttrial motion, this court should address the issue under the doctrine of plain error. The State counters that plain error is a narrow exception to the general rule of waiver and should be applied only where the evidence is closely balanced or where the error has deprived defendant of a fair trial. "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). However, in order to find plain error, this court must first find that the trial court committed some error. *People v. Rodriguez*, 387 Ill. App. 3d 812, 821 (2008).

In considering a challenge to the admissibility of evidence, we review whether the trial court's decision to allow the evidence in question was an abuse of discretion. *People v. Hawkins*, 326 Ill. App. 3d 992, 995 (2001). In general, the rule in Illinois is to preclude the introduction of evidence regarding polygraph examinations and their results. *People v. Jefferson*, 184 Ill. 2d 486, 492 (1998). The rationale behind the rule is that polygraph evidence is not sufficiently reliable for admission and, if admitted, is likely to be taken as determinative of guilt or innocence. *Jefferson*, 184 Ill. 2d at 493. However, there are exceptions to the rule of exclusion. *Jefferson*, 184 Ill. 2d at 493.

In *Jefferson*, our supreme court held that evidence of a scheduled polygraph examination was admissible. The defendant in *Jefferson* testified at trial that she signed an inculpatory statement because the officer told her that if she signed the statement, she could go home. While cross-examining the defendant, the State sought to present evidence regarding the defendant's agreement to take a polygraph test and her subsequent decision to confess prior to taking the scheduled polygraph. The trial court allowed the introduction of the evidence. Our supreme court held that the scheduled polygraph test was offered for the proper limited purpose of explaining the circumstances surrounding the defendant's confession after the defendant claimed at trial that her confession was induced by promises from a police officer. *Jefferson*, 184 Ill. 2d at 495-96.

However, in *People v. Jackson*, 202 Ill. 2d 361, 372 (2002), our supreme court held that the trial court erred in allowing the admission of evidence that a witness took a polygraph test. On direct examination by the State, the witness contradicted his earlier state-

ment inculpating the defendant, but did not say that the statement was coerced. *Jackson*, 202 Ill. 2d at 364-65. In response, the State asked the witness whether he had taken a polygraph test and was told by the examiner that he was a " 'liar' " prior to confessing. Defense counsel objected and the State responded that it was eliciting the evidence to show the " 'course of conduct' " leading to the witness's statement against the defendant. The trial court admitted the evidence, noting it would consider it " 'for a limited purpose' " but did not elaborate. *Jackson*, 202 Ill. 2d at 365. The State continued to question the witness, who testified that after he was confronted with the negative results of his polygraph test, he admitted his involvement in the crime and implicated the defendant. In subsequent testimony, the witness claimed for the first time that his statement against the defendant was coerced by the police. *Jackson*, 202 Ill. 2d at 365. Our supreme court reversed, concluding that when the trial court allowed the polygraph evidence, it served no legal purpose because the witness had not yet testified that his statement was coerced by the police. *Jackson*, 202 Ill. 2d at 370-71. Our supreme court found that it was "plain error to admit polygraph evidence in a criminal trial *in anticipation* of evidence potentially justifying its admission as an alternative explanation for an inculpatory statement." (Emphasis added.) *Jackson*, 202 Ill. 2d at 373. Our supreme court explained that polygraph evidence may be admitted on a limited basis only when the testimony is used as a "shield" against a defendant's claims of police misconduct, as in *Jefferson*, not as a "sword" to advance the State's case. *Jackson*, 202 Ill. 2d at 371.

In *People v. Binion*, 358 Ill. App. 3d 612 (2005), this court discussed our supreme court's holdings in *Jefferson* and *Jackson* and determined that the circuit court acted within its discretion in admitting evidence that a State witness took a polygraph examination. In *Binion*, the State's witness first testified on direct examination that his pretrial inculpatory statements were untrue and coerced by the police. On cross-examination, the witness disclosed, in response to a question from counsel for the defendant, that he had been taken for a polygraph examination. The circuit court allowed the State on redirect to explore the circumstances surrounding the statement, rebutting the witness's claim of coercion. This court found that, as in *Jefferson*, there was no anticipatory introduction of polygraph evidence because the State's witness's claim of coercion was already before the jury. *Binion*, 358 Ill. App. 3d at 624. This court explained that in the context of the witness's trial testimony that his pretrial statement was coerced, the witness's subsequent reference to the polygraph examination could have left the jury with the impression that the police first coerced a

statement from the witness and then forced him to undergo a polygraph examination. This court noted that the possibility of misleading the jury can be a determinative factor in the decision to admit polygraph evidence. *Binion*, 358 Ill. App. 3d at 624. This court explained that "[a] claim by a witness at trial that his pretrial statement was the product of police misconduct puts in play rebuttal evidence by the State that will bolster the voluntariness of the pretrial statement. One way to do this is to offer evidence of a polygraph examination." *Binion*, 358 Ill. App. 3d at 624-25. This court concluded that the evidence conformed to the recognized exception that allows polygraph evidence where the defense opened the door to its introduction and the State used the evidence to rebut the witness's claim of coercion. *Binion*, 358 Ill. App. 3d at 625, citing *Jefferson*, 184 Ill. 2d at 497-98.

■ Defendant argues that the exception to allow polygraph evidence did not apply in this case because, unlike *Jefferson* and *Binion*, defendant's polygraph examination was scheduled prior to defendant's inculpatory statement. However, we find that the recognized exception to allow polygraph evidence applied in this case where defendant himself introduced into evidence the fact that he took a polygraph examination. Defendant testified on direct examination that his videotaped statement was untrue and coerced by the police, as did the defendant in *Jefferson* and the witness in *Binion*. Defendant testified at length that he was beaten and deprived of food and drink while he was in police custody. Then, also during direct examination, defendant spontaneously testified that between beatings, the police officer asked him to take a polygraph test. Defendant testified that he agreed to take a polygraph test because "he had nothing to hide." Defendant testified that he provided the videotaped statement after the polygraph examination. The circuit court then allowed the State to rebut defendant's claim that his confession was coerced with evidence that defendant confessed after being confronted with the results of the polygraph examination. As in *Jefferson* and *Binion*, there was no anticipatory introduction of the polygraph evidence by the State because defendant's claim of coercion was before the jury. Therefore, the circuit court did not abuse its discretion because the evidence conformed to the recognized exception where defendant opened the door to the introduction of the polygraph evidence and the State used the evidence to rebut defendant's claim of coercion. *Jefferson*, 184 Ill. 2d at 497-98.

■ Defendant also contends that he was denied effective assistance of trial counsel where counsel violated his own motion *in limine* by using the word "polygraph" while questioning defendant. Defendant

argues that he was prejudiced because counsel's use of "polygraph" opened the door to allow the State to introduce otherwise inadmissible evidence.

The record shows that defense counsel questioned defendant about the interview sessions with police officers while defendant was in custody. Defense counsel asked defendant if the officers raised "any different subjects this time at all" and defendant testified that the detective asked him if he "would be willing to do a polygraph test." Defense counsel then asked defendant if he eventually participated in a polygraph test and defendant indicated that he had. While the circuit court initially ruled that the parties would use the term "additional forensic testing" instead of "polygraph," the court also had determined that the State would be allowed to present such evidence to rebut defendant's claims of coercion. As discussed, defendant's theory of defense throughout trial was that his confession was coerced. Defendant placed the reliability of his confession at issue before defendant used the term "polygraph" and, therefore, the State was going to be permitted to introduce the polygraph evidence to refute defendant's claim. *Jefferson*, 184 Ill. 2d at 493-95.

We also note that, contrary to defendant's contention, it was defendant himself who first used the term "polygraph" during his testimony. During the jury instruction conference, the circuit court raised the fact that defendant himself "brought up that he was asked and agreed to go for a polygraph" and defense counsel acknowledged that the word "polygraph" came from defendant's mouth. See *Binion*, 358 Ill. App. 3d at 624 (where the evidence of a polygraph test was elicited neither by the State nor the defense, but first made its way into the record from the mouth of a witness under cross-examination by the defense, the trial court did not abuse its discretion in admitting such evidence). We further note that defendant cannot benefit from a claim of error that he injected in this case. See *People v. Spicer*, 379 Ill. App. 3d 441, 463 (2007) (a defendant cannot complain on appeal about an error that was procured or invited by the defendant at trial). Accordingly, defendant has failed to show that he was prejudiced by his own testimony with respect to the polygraph examination. Defendant's failure to satisfy the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

■ Defendant also argues that the circuit court erred in allowing the State to elicit the "results" of defendant's polygraph examination. While the record shows that the actual results of the polygraph examination were not disclosed, defendant maintains that by accusing defendant of changing his statement after being "confronted with the

results" of his polygraph, "the State forced the implication upon the jury that defendant had failed his polygraph examination."

In *People v. Johnson*, 208 Ill. 2d 53, 104-05 (2003), our supreme court considered a similar argument. In *Johnson*, during the defendant's first degree murder trial, the police officer testified that when defendant returned from an " 'interview' " at the downtown police headquarters, defendant was " 'confronted with the results *** of his interview downtown.' " The officer testified that the defendant then gave an inculpatory statement. *Johnson*, 208 Ill. 2d at 94. The defendant presented two witnesses to testify that defendant had low intelligence and limited reading and comprehension skills. Defense counsel also presented arguments concerning the "reliability" of the defendant's statement. During closing argument, the State discussed the police officer's testimony and the events leading up to the defendant's statement. The State argued: " '[Defendant] knows they are on to him. He knows they are—it's starting to stack up against him. One last chance. Let me go downtown. I'll show you. When he bombs that and he comes back in, he's confronted with the results of his interview downtown, he knows it's over.' " *Johnson*, 208 Ill. 2d at 101.

Our supreme court determined that the police officer's testimony that defendant was "confronted with the results *** of his interview downtown" did not improperly signal to the jury that defendant had taken and failed a polygraph examination. *Johnson*, 208 Ill. 2d at 104. The court concluded that the testimony was sufficiently vague and did not include terms such as a "technician" or "examiner" that might alert the jury that a testing device was employed in the interview. *Johnson*, 208 Ill. 2d at 104. Our supreme court went on to find that the State's comments, when considered with the police officer's testimony, did suggest that the defendant had taken and failed a polygraph test. *Johnson*, 208 Ill. 2d at 104. The court noted that by stating that the defendant intended to " 'show' " the officers something by participating in an interview elsewhere, the prosecutor suggested that the defendant could conclusively demonstrate his innocence to authorities by participating in " 'the interview' " and that his guilt or innocence could be objectively verified by " 'the interview' " itself. The court also noted that by stating that defendant had " 'bombed' " the interview, the prosecutor used a term commonly associated with failure, particularly with failing a test. *Johnson*, 208 Ill. 2d at 104.

However, our supreme court determined that even if the jury speculated as to the prosecutor's references, the inference that the defendant had taken and failed a polygraph was, by that point in the

proceedings, properly drawn and considered. *Johnson*, 208 Ill. 2d at 105. The court explained that evidence that a polygraph examination had taken place could be properly considered because defense counsel had made the "reliability" of the defendant's statement an issue in his opening remarks to the jury and, by the time of closing arguments, defense counsel had elicited testimony calling into question the circumstances of the defendant's confession. Therefore, the reliability of the defendant's statement was an issue from the outset. Accordingly, the court concluded that "[c]omments regarding the timing of [defendant's] confession soon after his 'interview,' or polygraph if that is the characterization of the evidence one prefers, unequivocally *became* proper *after* [defendant] raised the issue of reliability at trial, first through the opening comments of his counsel and later by testimony." (Emphasis in original.) *Johnson*, 208 Ill. 2d at 105.

In so holding, our supreme court noted that the Court of Appeals for the Seventh Circuit, in *United States v. Kampiles*, 609 F.2d 1233 (7th Cir. 1979), upheld a trial judge's ruling that if a defendant were to testify that his confession had been coerced, the prosecution could then introduce evidence showing that the defendant made the confession after he was told that he had failed a polygraph test. *Johnson*, 208 Ill. 2d at 105. The *Kampiles* court explained, "It would have been unfair to allow defendant to present his account of his admissions *** without allowing the Government to demonstrate the extent to which failure of the polygraph precipitated confession." *Kampiles*, 609 F.2d at 1244. Our supreme court in *Johnson* noted that, as the court observed in *Jefferson*, while the general rule in Illinois is to preclude introduction of evidence regarding polygraph examinations and the results of those tests, evidence of this kind may become admissible when a defendant, during trial, offers an alternative explanation that led to a confession. *Johnson*, 208 Ill. 2d at 105, citing *Jefferson*, 184 Ill. 2d at 497.

In this case, as previously discussed, evidence that a polygraph examination had taken place could be properly introduced because defendant had made the reliability of his statement an issue throughout the trial. In *Johnson*, our supreme court indicated that an appropriate method to introduce such evidence is to solicit testimony using vague terminology, such as testimony that defendant was "confronted with the results *** of his interview downtown," so that the jury would not improperly speculate that defendant had taken or failed a polygraph examination. *Johnson*, 208 Ill. 2d at 103-04. Here, pursuant to the motion *in limine*, the State did not present evidence pertaining to the polygraph examination during its case in chief, but reserved the right to introduce such evidence to rebut any claims

defendant may present that his statement was coerced. We note that it was defendant himself, during his direct examination, who raised the issue of the polygraph examination. After defendant testified that he agreed to submit to a "polygraph examination," it was no longer necessary for the State to use the vague terminology employed in *Johnson*. However, the State's cross-examination to the effect that defendant confessed only after the detectives "confronted [him] with the *results* of the polygraph examination that [defendant] agreed to take" remains problematic. Clearly, there was no proper purpose served by injecting the word "results" into the questioning. While this appears to be an instance of overreaching, defendant cannot benefit from the error that he injected in this case. *Spicer*, 379 Ill. App. 3d at 463.

We further note that, in *Johnson*, our supreme court determined that even if the jury had speculated at the time of the prosecutor's closing argument that the defendant had taken and failed a polygraph, the inference was, by that point in the proceedings, properly drawn and considered. *Johnson*, 208 Ill. 2d at 104-05. Similarly, in this case, evidence that a polygraph examination had taken place could be properly considered because defense counsel made the reliability of defendant's statement an issue in his opening remarks and throughout trial, including during defendant's testimony. After defendant's testimony that he submitted to a polygraph examination, the State's argument that defendant provided his statement after being "confronted with the results" of the polygraph was not improper. As our supreme court noted, where the defendant "ma[de] the circumstances of his confession an issue in the case, [he] opened the door for a prosecutorial argument suggesting—without specifically stating—that [defendant] had confessed after he failed a polygraph exam[ination]." *Johnson*, 208 Ill. 2d at 106. For the above reasons, we cannot say that the circuit court abused its discretion in allowing the polygraph evidence. Since we find no error, this court need not engage in a plain error analysis. *Rodriguez*, 387 Ill. App. 3d at 821.

■ Defendant lastly contends that the circuit court erred by failing to submit a nonpattern instruction to the jury on the limited use of the polygraph evidence.

The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence. *People v. Parker*, 223 Ill. 2d 494, 501 (2006). Jury instructions should not be misleading or confusing. Their correctness depends not on whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand

them. *People v. Bannister*, 232 Ill. 2d 52 (2008). If pattern instructions contain an applicable instruction on a subject about which the trial court determines the jury should be instructed, the trial court must use that instruction, unless the court determines that the instruction does not accurately state the law. 177 Ill. 2d R. 451(a); *Bannister*, 232 Ill. 2d 52. That is, where a pattern instruction does not accurately state the law, Supreme Court Rule 451(a) authorizes the trial court to modify it. 177 Ill. 2d R. 451(a); *Bannister*, 232 Ill. 2d 52. The decision whether to give a nonpattern instruction rests within the sound discretion of the trial court. *Bannister*, 232 Ill. 2d 52. Whether a court has abused its discretion will depend on whether the nonpattern instruction is an accurate, simple, brief, impartial, and nonargumentative statement of the law. 177 Ill. 2d R. 451(a); *Bannister*, 232 Ill. 2d 52.

The record shows that during the jury instruction conference, the circuit court noted that defendant "brought up that he was asked and agreed to go for a polygraph." The circuit court then considered "how [to] shape an instruction that's never been shaped in this circumstance." Defendant and the State submitted the following proposed nonpattern limiting instruction:

> "Defendant submitted to a polygraph examination. This evidence is being received for a limited purpose of deciding the issues of the circumstances leading to defendant's [statement]."

After discussing the proposed instruction at length, the circuit court noted that case law did not provide "guidance in these cases as to what instruction if any should be given." The circuit court determined that it did not seem "prudent" to have the parties "invent an instruction for this situation" and, therefore, declined to submit the proposed nonpattern instruction.

In support of his argument that the circuit court abused its discretion by failing to submit the nonpattern instruction to the jury, defendant relies on this court's decision in *People v. Rosemond*, 339 Ill. App. 3d 51 (2003). In *Rosemond*, this court determined that the State was not entitled to present polygraph evidence to rebut evidence that the State characterized as coercive. This court explained that the State, not defense counsel, elicited details about the defendant's emotional reaction to the detective's actions of popping his fingers in the defendant's face during interrogation and the detective's statements that the defendant was a gang member and that he hated gang members. This court noted that the jury could have concluded that defendant's confession was reliable based on facts elicited through the testimony of the State's witnesses. *Rosemond*, 339 Ill. App. 3d at 61-63.

In *Rosemond*, this court also found that the error in admitting the polygraph evidence was exacerbated by the jury instructions. *Rosemond*, 339 Ill. App. 3d at 63. The instruction in that case advised the jury as follows:

" 'You have heard testimony concerning a polygraph test. The results of any polygraph examination are not admissible as evidence and should not be considered by you in any way. You should not speculate upon the nonexistence of results on the issue of defendant's guilt or innocence. The evidence is to be considered solely for the purpose of determining the credibility and reliability of any subsequent statements.' " *Rosemond*, 339 Ill. App. 3d at 63.

This court determined that this nonpattern instruction was improperly submitted to the jury. This court explained that the defendant never alleged that coercive police conduct impaired the reliability or truthfulness of his statement and, therefore, it was not proper for the jury to be instructed to consider the polygraph evidence for those purposes. *Rosemond*, 339 Ill. App. 3d at 64.

The *Rosemond* court held that: "[B]efore a trial court allows the State to introduce polygraph evidence at trial under the *Jefferson* exception, the trial court should apply enhanced scrutiny to ensure that any references to a polygraph are necessary and of minimal prejudicial impact and that no other appropriate alternative impeachment evidence is available to the State. In addition, the trial court must formulate a clear cautionary instruction for the jury." *Rosemond*, 339 Ill. App. 3d at 61. We note that while the *Rosemond* court found that a cautionary instruction for the jury was required, the court failed to provide citation to support the requirement and did not provide guidance as to what a proper instruction would include.

In *People v. Binion*, 358 Ill. App. 3d 612, 624 (2005), this court determined that the circuit court acted within its discretion in admitting evidence that a State's witness had taken a polygraph examination. In *Binion*, the State's witness testified that his pretrial statement inculpating defendant was coerced and then, on cross-examination, made spontaneous references to a polygraph examination. *Binion*, 358 Ill. App. 3d at 615-16. The circuit court allowed the State on redirect to examine the circumstances surrounding the statement to rebut the witness's claim of coercion that was already before the jury. *Binion*, 358 Ill. App. 3d at 616. The circuit court then admonished the jury as follows:

" 'You just heard some testimony concerning this witness's trip to take a lie detector test, okay. Now, the results of a lie detector test are not admissible in evidence. And I don't want you to try to surmise what the [result] of that lie detector was one way or the

other. The only reason that you are hearing testimony concerning [the witness] going to the lie detector test was to place that trip chronologically within the course of the police investigation. And you're to consider it for that purpose only.

I'm specifically instructing you not to attempt to surmise what the results of that lie detector test was, okay.' " *Binion*, 358 Ill. App. 3d at 616-17.

On appeal, in *Binion*, this court determined that the admission of the polygraph evidence was proper to rebut the witness's claim of coercion and where the circuit court gave limiting instructions to the jury, explaining how the evidence was and was not to be used. *Binion*, 358 Ill. App. 3d at 624.

Similarly, in *People v. Guerrero*, 356 Ill. App. 3d 22, 31 (2005), this court determined that evidence that the defendant offered to take a polygraph examination but then provided an inculpatory statement before taking the examination was admissible to detail the sequence of events. This court explained that the circuit court noted that any statements made were independent of the polygraph exam and the circuit court defined its limited purpose on the record, as follows:

" '[T]he government will be allowed to elicit in the *sequence of events*. At one point they went to a polygraph examiner's location and that certain things may have been said *independent* of any polygraph exam.' " (Emphasis in original.) *Guerrero*, 356 Ill. App. 3d at 31.

This court determined that the circuit court merely allowed the admission of evidence of the defendant's scheduled polygraph examination based on a limited purpose and did not go beyond that purpose. Therefore, this court found no error in allowing the reference to the scheduled polygraph examination. *Guerrero*, 356 Ill. App. 3d at 31.

In this case, the circuit court determined that the State would be allowed to elicit evidence of defendant's polygraph examination for the specific purpose to rebut defendant's claim of coercion. While the proposed nonpattern jury instruction correctly explained that the polygraph evidence was admitted for the limited purpose of deciding the circumstances surrounding defendant's statement, we cannot say the circuit court abused its discretion in declining to submit the nonpattern instruction to the jury. The record shows that the jury was instructed that "Any evidence that was received for a limited purpose should not be considered by you for any other purpose." The jury was also instructed, pursuant to Illinois Pattern Jury Instructions, Criminal, No. 3.06—3.07 (4th ed. 2000) (hereinafter IPI Criminal 4th), to consider the "circumstances" of the defendant's confession and to determine its "weight." IPI Criminal 4th No. 3.06—3.07 states:

"You have before you evidence that [(the) (a)] defendant made [a] statement[s] relating to the offense[s] charged in the [(indictment) (information) (complaint)]. It is for you to determine [whether the defendant made the statement[s], and, if so], what weight should be given to the statement[s]. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

In *Jefferson*, 184 Ill. 2d at 498, the jury received IPI Criminal 4th No. 3.06—3.07 along with a nonpattern limiting instruction that advised the jury in the following terms:

" '[Y]ou heard some testimony concerning a polygraph test. You may consider that evidence for a limited purpose only, not for the fact that someone did or didn't take a polygraph test. You will consider it only for the limited purpose of deciding whether the statement given by the defendant was voluntary or involuntary, for that purpose only, a limited purpose.' "

Our supreme court found that this limiting instruction was incorrect because the voluntariness of a confession is to be determined by the trial judge alone. *Jefferson*, 184 Ill. 2d at 498. Our supreme court noted that while the admissibility of the confession shall not be submitted to the jury, " '[t]he circumstances surrounding the making of the confession may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession.' " *Jefferson*, 184 Ill. 2d at 498, quoting 725 ILCS 5/114—11(f) (West 1994).

In *Jefferson*, despite the incorrect limiting instruction, our supreme court determined that it was not reversible error under the circumstances of that case. The court held that "[n]otwithstanding the use of the term 'voluntariness' in the cautionary instruction, we do not believe that the jury would have misconstrued the significance of the polygraph evidence or would have considered it for some purpose other than the one for which it was offered." *Jefferson*, 184 Ill. 2d at 499. The court explained that the jury received the separate instruction regarding the defendant's inculpatory statement, pursuant to IPI Criminal 4th No. 3.06—3.07. Our supreme court determined that this "instruction correctly shaped and guided the jury's inquiry, and we believe that the jurors *** would have understood their task to involve a determination whether the defendant's statement was unreliable because it had been induced by promises from the authorities, as the defendant asserted." *Jefferson*, 184 Ill. 2d at 499.

In this case, while the circuit court exercised its discretion in declining to submit the nonpattern limiting instruction, the jury was properly instructed pursuant to IPI Criminal 4th No. 3.06—3.07. This IPI instruction accurately stated the law with respect to defendant's

inculpatory statement. *Jefferson*, 184 Ill. 2d at 499-500. Therefore, the circuit court properly submitted IPI Criminal 4th No. 3.06—3.07 to the jury. *Bannister*, 232 Ill. 2d 52. We find that this instruction correctly advised the jury and the jury would have understood its task to determine the reliability of defendant's videotaped statement.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

MURPHY, P.J., and COLEMAN, J., concur.