# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***Taylor v. County of Cook*, 2011 IL App (1st) 093085**

| | |
|---|---|
| Appellate Court Caption | RAVEN TAYLOR, Plaintiff-Appellant, v. THE COUNTY OF COOK, a Body Politic, d/b/a John H. Stroger, Jr. Hospital, and OAK FOREST HOSPITAL, VIGNESH NARAYANAN, JANE PERRIN, SARITA BAJRACHARYA, JOEL BLOCK, AUGUSTINE MANADAN, SERGEY FURMANOV, THERESA McCARTHY, ERNEST CHENG, and MIA MARIKA G. LAZO, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-09-3085 |
| Filed | July 21, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The verdict for defendants in a medical malpractice action alleging negligent treatment was affirmed where the trial court did not abuse its discretion in various evidentiary rulings relating to the parties' experts or in modifying instructions dealing with inconsistent witness conduct and the adjustment of verdict awards. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-004953; the Hon. Donald J. O'Brien, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Raymond & Raymond, Ltd., of Schaumburg (Patricia E. Raymond and Clark M. Raymond, of counsel), for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., Jeff McCutchan, William Buenger, Sharon Opryszek, and Sandra Weber, Assistant State's Attorneys, of counsel), for appellees County of Cook, Augustine Manadan, and Sergey Furmanov. |
| | Anderson, Rasor & Partners, LLP, of Chicago (Susan M. Hannigan, of counsel), for appellee Joel Block. |
| Panel | JUSTICE STERBA delivered the judgment of the court, with opinion. Justices Pucinski and Salone concurred in the judgment and opinion. |

**OPINION**

¶ 1    In this medical malpractice case based on doctors' negligence, the jury found in favor of defendant doctors Joel Block, Augustine Manadan and Sergey Furmanov and defendant Cook County Hospital. Plaintiff Raven Taylor appeals the circuit court's evidentiary rulings claiming that the errors resulted in prejudice and affected the outcome of her case. Taylor claims that the circuit court abused its discretion when it: (1) barred cross-examination of an expert witness concerning personal practice in treating patients diagnosed with polymyositis; (2) allowed Dr. Block's expert to testify regarding the applicable "standard of care" despite the expert's lack of understanding of the term "standard of care"; (3) allowed multiple experts to testify regarding the standard of care, causation and damages on the defendants' collective behalf; and (4) allowed defendants' experts to testify in violation of Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007). Taylor also claims that the circuit court erred when it ruled that Taylor raised a new claim of lack of informed consent during trial. Taylor further claims that the circuit court erred in limiting the admissibility of her expert's testimony since the testimony was a logical corollary to disclosed opinions. Regarding the jury instructions, Taylor claims that the circuit court abused its discretion in modifying two instructions, which dealt with inconsistent witness conduct and adjustment of verdict awards. Taylor's last claim is that the errors deprived her of a fair trial. For the reasons stated below, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3          The following facts are relevant to the instant appeal. In May 2005, Dr. Furmanov was a rheumatology fellow at the Cook County Hospital Rheumatology Clinic. Dr. Block supervised Dr. Furmanov in May 2005. Dr. Manadan supervised Dr. Furmanov in June 2005. In May 2005, Taylor was diagnosed with severe polymyositis, which is an inflammation of the muscles and results in weakened muscles. Defendant doctors diagnosed Taylor and began treating her for the condition. Taylor's polymyositis rapidly progressed, leaving her with permanent disabilities.

¶ 4          On May 11, 2006, Taylor filed an 11-count complaint. Taylor filed an amended four count complaint on April 20, 2009, which included the following counts: (1) negligence: Cook County Hospital; (2) negligence: Joel Block; (3) negligence: Augustine Manadan; and (4) negligence: Sergey Furmanov.

¶ 5          Taylor's jury trial took place from April 15, 2009, through May 6, 2009. Before the trial began, the parties filed motions *in limine*. Dr. Block filed a motion *in limine* to bar cross-examination of his expert, Dr. Amato, regarding his personal practice in treating patients with polymyositis. The circuit court granted this motion. Taylor filed a motion *in limine* to bar defendants' experts' testimony on the basis that the testimony was cumulative and the defense was aligned. Taylor claimed that the testimony regarding causation and standard of care would be cumulative and overwhelming because testimony regarding those issues would be provided by the defendants' three experts, the defendant doctors individually and three doctors employed at defendant hospital. Thus, Taylor claimed that each defendant would have nine doctors testifying regarding the standard of care. The circuit court denied this motion.

¶ 6          During the trial, Taylor testified on her behalf. Taylor called Dr. Anthony Bohan, as an expert, to testify regarding the standard of care defendants provided to Taylor and in treating polymyositis. Taylor's and Dr. Bohan's testimony is summarized below. Defendant Cook County Hospital called Dr. Oddis as an expert, and Dr. Block called Dr. Wortmann and Dr. Amato as experts. Defendants' experts testified regarding the applicable standard of care in treating polymyositis, and on the issues of causation and damages. Defendants' experts' testimony is summarized below.

¶ 7          During trial, Taylor testified that she was 19 years old in the spring of 2005 and was attending Butler University located in Indianapolis. Taylor went to the emergency room in March 2005 because she had a migraine and was losing her peripheral vision. Taylor was sent home with ibuprofen. Taylor began struggling to get to her class on the third floor of a building when she took the stairs carrying her backpack. Approximately two weeks later after returning to the Chicago area, Taylor went to Oak Forest Hospital because she was very stiff and her joints and knees hurt. The hospital admitted Taylor and she stayed there for two or three days. Taylor was discharged from the hospital and returned to school. The doctor at Oak Forest Hospital scheduled an appointment for Taylor at the gastrointestinal clinic at Cook County Hospital on April 22, 2005. Taylor went to the appointment and stated that she was achy and that her joints and body were hurting. Taylor returned to Cook County Hospital on April 26, 2005, and described the same ailments to the doctors. Taylor again returned to

Cook County Hospital on May 3, 2005, but this time she was accompanied by her aunt, Gwendolyn Johnson. When they arrived at the clinic, Johnson retrieved a wheelchair for Taylor because she was walking very slowly. On May 4, 2005, Taylor was admitted into Cook County Hospital. Taylor's mom took her to the hospital because a doctor told Johnson that Taylor's kidneys were failing.

¶ 8    Taylor was admitted at Cook County Hospital from May 4 through May 10, 2005. During her hospital admission, Taylor saw Dr. Furmanov twice, and she became more weak. Taylor needed a muscle biopsy to confirm a diagnosis of polymyositis. While she was at Cook County Hospital, Taylor received prednisone to treat the suspected diagnosis of polymyositis. Doctors Block and Furmanov did not discuss other treatment options with Taylor. Taylor was transferred to Oak Forest Hospital to receive in-patient physical therapy. Taylor's diagnosis of polymyositis was confirmed while she was at Oak Forest Hospital and she began doing passive range of motion exercises.

¶ 9    Taylor visited the rheumatology clinic at Cook County Hospital on May 27, 2005. Because Taylor was unhappy at Oak Forest Hospital, she asked Dr. Furmanov if she could be discharged from that hospital. Dr. Furmanov agreed to the request since her family could learn the daily activity care that she was receiving at Oak Forest Hospital. Dr. Furmanov prescribed azathioprine as additional medicine and did not give her any other treatment options. Taylor was discharged from Oak Forest Hospital on June 4, 2005. On approximately June 10, 2005, Taylor returned to the rheumatology clinic at Cook County Hospital. Taylor only remembers that she saw Dr. Manadan during this visit. Taylor testified that she has been on steroids continuously since May 6, 2005.

¶ 10    Dr. Anthony Bohan testified as an expert on Taylor's behalf. Dr. Bohan is a rheumatologist who treats patients diagnosed with polymyositis. Dr. Bohan has experience with hundreds of polymyositis cases throughout his career and has seen approximately five severe polymyositis cases like Taylor's. Polymyositis is a disease that occurs when the immune system begins to attack the muscle fibers and causes inflammation of the muscles. A patient who first develops polymyositis experiences weakness, tiredness and fatigue. When the symptoms progress enough for the patient to visit a doctor, a doctor performs a blood test. The results of the blood test reveals an increase in CPK enzymes in the bloodstream. The CPK enzyme level informs the doctor that there is inflamation of the muscle because the CPK enzymes leak out of the muscle fibers into the blood when there is inflammation or damage to the muscle fibers. In severe polymyositis cases, muscle weakness develops very rapidly and deteriorating muscle strength is apparent. The muscles in a severe polymyositis case become swelled and inflamed, causing muscle pain. As the disease progresses, the patient experiences difficulty breathing because the chest muscles do not have the strength to expand the lungs, difficulty swallowing because the muscles in the esophagus do not work and difficulty eating, requiring a gastric tube.

¶ 11    Dr. Bohan stated that a corticosteroid, such as prednisone, is commonly used to reduce the muscle inflamation. Solu-Medrol is the intravenous (IV) form of prednisone and is marginally stronger than prednisone. Immunosuppressive drugs suppress the immune system. The drug Imuran and its generic equivalent azathoprine is also used to treat polymyositis, as is the drug methotrexate, which are immunosuppressive drugs. Imuran takes months to work

and methotrexate works in weeks. Prednisone begins to work in four hours and in treating polymyositis shows its effect within days. Providing Solu-Medrol or IV pulse therapy three days in a row typically demonstrates effects in treating polymyositis within days.

¶ 12    Dr. Bohan testified that defendants breached the standard of care causing severe and permanent injury to Taylor. When Taylor was seen at Cook County Hospital on May 4, 2005, her illness had been progressing for approximately six weeks. While Taylor was admitted at Cook County Hospital, the polymyositis progressed and her strength upon discharge to Oak Forest Hospital deteriorated to essentially zero. Also during her admission at Cook County Hospital, her CPK enzyme level "was hugely elevated," denoting the fact that "very, very aggressive inflammation going on in her muscles at that time." Dr. Bohan also expressed the opinion that the defendant Doctors Block and Furmanov did not render treatment to Taylor on May 6, 2005, that complied with the standard of care because they prescribed 60 milligrams of prednisone even though she had an extraordinarily rapid and severe disease that required much more aggressive treatment. Dr. Bohan opined that "the standard of care required much more aggressive treatment, she should have been treated right off the bat day one with at least 100 milligrams of Prednisone, not 60, maybe 120." Dr. Bohan further opined that "the standard of care required either intravenous high dose–very high dose methylprednisolone, Medrol, Solu-Medrol, 1,000 milligrams IV for three days and/or–and/or 100 to 120 milligrams of Prednisone per day, that was the standard of care." Dr. Bohan also stated that immunosuppressives, such as methotrexate, should have been initiated within a week of prescribing prednisone.

¶ 13    Dr. Bohan's opinion was that Taylor's transfer from an acute care hospital to a rehabilitation facility worsened her condition. Dr. Bohan believed that continuous monitoring by a rheumatologist at the time of transfer was critical. Dr. Bohan also stated that rehabilitation doctors are experienced in providing rehabilitative care, but are not experienced in treating a patient with polymyositis.

¶ 14    Dr. Bohan's opinion was also that defendants deviated from the standard of care following Taylor's May 27, 2005, office visit. According to Dr. Bohan, the standard of care required Dr. Furmanov to transfer Taylor back to Cook County Hospital for careful monitoring and to increase the dosage of prednisone, as well as starting Taylor on methotrexate, a more rapidly acting drug than Imuran, which the doctors prescribed for Taylor. Dr. Bohan also expressed his opinion that due to the treatment that defendants provided to Taylor, the polymyositis became more refractory to treatment and more damage occurred to Taylor's muscles. When a disease becomes refractory to treatment, the disease is more difficult to bring under control at a later stage than it would have been if it was treated at an earlier stage. When treating a patient, a window of opportunity to treat the disease exists, and if the disease is untreated within that window, the disease becomes refractory to treatment.

¶ 15    Dr. Chester Oddis testified on behalf of Cook County Hospital. Dr. Oddis specializes in rheumatology with a special interest in myositis, which includes polymyositis. Dr. Oddis testified that there are a variety of options to treat polymyositis, which is a rare disease. The hallmark therapy is high-dose prednisone therapy. The disease could also be treated with an intravenous steroid or with an immunosuppressive. Dr. Oddis testified that Doctors

Manadan, Block and Furmanov complied with the standard of care in treating Taylor. Specifically, it was within the standard of care for Doctors Block and Furmanov to treat Taylor with 60 milligrams of prednisone. Doctors Furmanov and Block also complied with the standard of care when they allowed Taylor to transfer to Oak Forest Hospital for rehabilitative treatment. Doctors Furmanov and Block also complied with the standard of care on May 27, 2005, when they continued Taylor on 60 milligrams of prednisone and added 100 milligrams of azathioprine. Dr. Oddis further opined that it would have been within the standard of care to treat Taylor with methotrexate. During Taylor's June 10, 2005 visit, it was within the standard of care for Doctors Manadan and Furmanov to maintain Taylor on 60 milligrams of prednisone and increase the dosage of azathioprine from 100 to 150 milligrams.

¶ 16    During cross-examination, Dr. Oddis testified that when Taylor was transferred to Oak Forest Hospital for rehabilitation, Doctors Block and Furmanov were required to provide instructions to the rehabilitation facility regarding her care. The instructions regarding physical therapy and the range of motion exercises would have been determined by the rehabilitation specialists in conjunction with the rheumatologist. Dr. Oddis testified that the standard of care required Doctors Block and Furmanov to inform the doctors at Oak Forest Hospital that if Taylor's condition deteriorated, they must call and inform the rheumatologists of Taylor's weakening condition. On redirect, Dr. Oddis clarified that the decision of what type of therapy a polymyositis patient requires is not dictated by a rheumatologist, but by the rehabilitation doctor who is specialized in treating patients with neuromuscular diseases.

¶ 17    Dr. Robert Wortmann testified on behalf of Dr. Block. Dr. Wortmann practiced in rheumatology with a special subinterest in crystal-induced arthritis and in diseases that affect skeletal muscles. Dr. Wortmann testified that various options existed in 2005 to treat myositis. According to Dr. Wortmann, the experts state that steroids are the first treatment for myositis and the dosage ranges from 60 milligrams a day to 1 or 2 milligrams per kilogram. Other options included treating the patient with IV steroids or use the combination of steroids and a medicine such as azathioprine or methotrexate. Dr. Wortmann opined that defendant Doctors Block and Furmanov complied with the standard of care in treating Taylor from May 5 through May 27, 2005.

¶ 18    Dr. Anthony Amato testified through a videotaped evidence deposition on behalf of Dr. Block. Dr. Amato's speciality is in neurology, with a subspeciality in neuromuscular medicine and neuromuscular disease. Polymyositis is a neuromuscular disease. In 2005, multiple options existed within the standard of care to treat a patient with polymyositis. One option was to treat the patient with 60 milligrams of prednisone, as defendant rheumatologists did in treating Taylor. Other options included: (1) starting the patient with 100 milligrams of prednisone for two weeks and then reducing the treatment to every other day; (2) starting the patient with Solu-Medrol IV for three days; (3) starting a second line agent, such as Imuran or methotrexate; (4) starting treatment with mycophenolate mofetil; and (5) starting IVIG therapy. Dr. Amato opined that Dr. Block complied with the standard of care in treating Taylor in 2005. Dr. Amato elaborated that there is no one right way to treat polymyositis nor are there two right ways to treat the disease because many treatment options

exist.

¶ 19      During cross-examination, Dr. Amato stated that the drug methotrexate was a treatment option for Taylor. The side effects of methotrexate could have been discussed with Taylor. Dr. Amato also stated that a reasonably well-qualified rheumatologist and/or neurologist would be required to go over treatment options with Taylor.

¶ 20      Throughout the approximate three-week trial, numerous Rule 213 objections were raised by both parties and the circuit court sustained some and overruled other objections. During the jury instructions conference, the parties agreed that any instruction falling within the numeric sequence of 1.01 through 3.01 would be obtained from the 1995 Illinois Pattern Jury Instructions, Civil (IPI). Taylor proposed the following two pattern instructions:

> (1) Illinois Pattern Jury Instructions, Civil, No. 3.01 (1995) (hereinafter, IPI Civil (1995) No. 3.01), which states:
>
> > "The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement or acted in a manner inconsistent with the testimony of the witness in this case on a matter material to the issues. Evidence of this kind may be considered by you in connection with all the other facts and circumstances in evidence in deciding the weight to be given to the testimony of that witness."
>
> (2) Illinois Pattern Jury Instructions, Civil, No. 3.03 (Supp. 2008) (hereinafter, IPI Civil (Supp. 2008) No. 3.03), which states:
>
> > "Whether a party is insured or not insured has no bearing on any issue that you must decide. You must refrain from any inference, speculation, or discussion about insurance.
> >
> > If you find for the plaintiff, you shall not speculate about or consider any possible sources of benefits the plaintiff may have received or might receive. After you have returned your verdict, the court will make whatever adjustments are necessary in this regard."

¶ 21      The circuit court modified the above proposed instructions. In IPI Civil (1995) No. 3.01, the circuit court deleted "or acted in a manner inconsistent" from the instruction. In IPI Civil (Supp. 2008) No. 3.03, the circuit court deleted the last sentence of the instruction. The jury found in favor of defendants on May 6, 2009. Taylor filed a posttrial motion on July 22, 2009, which the circuit court denied on October 2, 2009. Taylor timely appealed.

¶ 22                     II. STANDARD OF REVIEW

¶ 23      A circuit court's evidentiary rulings regarding the admissibility of testimony and on a motion *in limine* are within its sound discretion and this court will not reverse such rulings unless the circuit court abused its discretion. *Davis v. Kraff*, 405 Ill. App. 3d 20, 28 (2010). A circuit court abuses its discretion when its ruling "is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion standard is highly deferential to the circuit court. *Davis*, 405 Ill. App. 3d at 28.

¶ 24                                    III. ANALYSIS

¶ 25                               A. Expert Witness Testimony

¶ 26        On appeal, Taylor first raises four claims of error regarding the circuit court's rulings on the admissibility of defendants' expert witness testimony. First, Taylor claims that the circuit court abused its discretion in granting Dr. Block's motion *in limine* to exclude the cross-examination of Dr. Amato about his personal practice in treating a patient with severe polymyositis. Taylor claims that Dr. Amato stated in his evidence deposition that treatment with 60 milligrams of prednisone was within the standard of care, but stated in his discovery deposition that he provides three-day IV pulse therapy to patients with severe polymyositis. Taylor claims that the circuit court erred when it did not allow Taylor to impeach Dr. Amato with his testimony that 60 milligrams of prednisone was within the standard of care, but in his practice, he prescribes IV pulse therapy to patients with severe polymyositis.

¶ 27        The circuit court did not abuse its discretion in granting Dr. Block's motion *in limine* limiting Taylor's cross-examination of Dr. Amato. During his evidence deposition, Dr. Amato stated that multiple treatment options exist that comply with the standard of care to treat a patient with severe polymyositis, which consisted of 60 milligrams of prednisone, 120 milligrams of prednisone and IV pulse therapy for three days. In treating his patients, Dr. Amato prefers the pulse therapy treatment option. Taylor sought to impeach Dr. Amato based upon his preference of using the pulse therapy to treat his patients exhibiting severe polymyositis. Dr. Amato's preference to use one of the three treatment options that he opined is within the standard of care to treat polymyositis does not give rise to permissible impeachment testimony. Dr. Amato's preference for one method is not inconsistent with his testimony that three treatment options exist, including his preferred option and the option used by defendants.

¶ 28        Taylor's reliance on *Gallina v. Watson*, 354 Ill. App. 3d 515 (2005), and *Schmitz v. Binette*, 368 Ill. App. 3d 447 (2006), is misplaced. In *Gallina*, a medical expert testified that his personal practice was to always treat type II fractures with surgery and the defendant physician did not violate the standard of care by not performing surgery on the patient, who had such a fracture. *Gallina*, 354 Ill. App. 3d at 521. This court held that the trial court abused its discretion in excluding the testimony because the testimony was relevant in establishing the expert's credibility in rendering his opinion that the defendant physician acted within the standard of care. *Id.* In *Schmitz*, the medical expert testified at trial that the standard of care did not require a doctor to perform an indigo carmine dye test and that the test was unreasonably dangerous and ineffective. *Schmitz*, 368 Ill. App. 3d at 461-62. During his deposition, the medical expert stated that he personally performed the test " 'quite readily, quite commonly.' " *Id.* at 461. This court held that the jury was entitled to hear the inconsistent testimony, which may have provided additional insight to the jury regarding the testimony. *Id.*

¶ 29        Here, the circuit court did not err in barring the cross-examination of Dr. Amato because no inconsistent testimony exists and Dr. Amato's credibility was not compromised based on his testimony. Dr. Amato's testimony that he would have treated Taylor using pulse therapy

is not inconsistent with his testimony that prescribing 60 milligrams of prednisone as defendant doctors did to treat a patient with severe polymyositis was within the standard of care. Unlike in *Gallina*, Dr. Amato did not state that he always uses the IV pulse therapy or that he never uses the 60 milligrams of prednisone treatment provided by defendant doctors, thereby raising a question concerning his credibility. Dr. Amato also did not testify that treating a patient with pulse therapy was dangerous but that he nonetheless provides this treatment to patients, thereby raising a credibility issue for the jury to decide as in *Schmitz*. In light of the consistency in Dr. Amato's testimony as to the treatment options considered within the standard of care and his preference for one of the options, we conclude that the circuit court did not abuse its discretion in granting defendant Dr. Block's motion *in limine* to exclude Dr. Amato's personal practice testimony.

¶ 30    Taylor's second claim of error is that the circuit court abused its discretion in admitting Dr. Amato's standard of care testimony because he incorrectly defined the phrase "standard of care" during his discovery deposition. Taylor claims that to be consistent with Illinois pattern jury instructions, "standard of care" should be defined as "what a reasonably careful doctor would do or would not do under circumstances similar to those shown by the evidence." Taylor maintains that Dr. Amato's definition of "standard of care" as "what a reasonable physician might consider appropriate in terms of evaluation or treatment" was not a correct definition because Dr. Amato did not include "in the same or similar circumstances" in his definition. Taylor similarly contends that Dr. Amato's definition was incorrect because he defined the standard of care as "what a physician *might* do" instead of "what a physician *would* do." (Emphasis added.). Thus, Taylor claims that the jury should not have considered Dr. Amato's testimony regarding the "standard of care" because his testimony was unreliable given his incorrect definition of "standard of care." Taylor claims that because Dr. Amato did not correctly define "standard of care," he did not understand what "standard of care" meant, rendering his testimony unreliable. Accordingly, Taylor claims that the circuit court abused its discretion in allowing Dr. Amato to testify regarding the standard of care in treating polymyositis.

¶ 31    The circuit court did not abuse its discretion in admitting Dr. Amato's standard of care testimony. Taylor's complained-of definition of "standard of care" provided by Dr. Amato was not submitted to the jury because it was stricken from Dr. Amato's evidence deposition and, thus, had no prejudicial impact upon the jury. Nonetheless, Taylor claims that Dr. Amato's standard of care testimony was unreliable because Dr. Amato misunderstood the correct meaning of "standard of care."

¶ 32    In medical negligence actions, the plaintiff bears the burden of establishing the standard of care by which the defendant doctor's conduct is to be measured against through expert witness testimony. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 24 (1996). For expert testimony to be admissible, an adequate foundation must be laid establishing that the information that the expert bases the opinion upon is reliable. *Ford v. Grizzle*, 398 Ill. App. 3d 639, 649 (2010). Expert testimony is admissible "if the proffered expert is qualified as an expert by knowledge, skill, experience, training, or education and the testimony will assist the trier of fact in understanding the evidence." *Matuszak v. Cerniak*, 346 Ill. App. 3d 766, 771-72 (2004).

¶ 33    Here, the omission of "from similar circumstances" in Dr. Amato's definition of "standard of care" and use of the word "might" instead of "would" does not render his testimony unreliable. Dr. Amato stated his qualifications in his evidence deposition, including his education, training and experiences as a physician treating patients with polymyositis. *Ford*, 398 Ill. App. 3d at 649. Dr. Amato based his testimony upon his experience as a specialist who treats polymyositis, what he has taught about the disease and what he has read through the literature. Dr. Amato's definition of the term "standard of care" and its failure to comply verbatim with the Illinois pattern jury instruction definition of the term does not render an otherwise reliable testimony unreliable. Since Dr. Amato is a medical physician who specializes in polymyositis, the circuit court did not abuse its discretion in admitting his testimony regarding the standard of care. Moreover, Dr. Amato's definition of "standard of care" was not submitted to the jury and the circuit court read the Illinois pattern jury instruction definition of "standard of care" to the jury. Thus, the jury would not have been misled by Dr. Amato's definition of "standard of care."

¶ 34    Taylor's third claim is that the circuit court erred in allowing defendants to elicit from multiple expert witnesses the applicable standard of care and causation testimony. Taylor contends that defendants' expert doctors, Oddis, Amato and Wortmann, testified that defendants all complied with the standard of care, and the experts all testified regarding causation and damages. Taylor claims that because the defendants had an aligned defense, expert testimony should have been limited based on the cumulative nature of the testimony. Taylor also claims that an imbalance existed regarding the evidence presented at trial because the circuit court granted defendants' motion *in limine* to limit Taylor's expert witnesses and to limit Taylor's aunt Johnson's testimony. Taylor maintains that the impact of the expert witnesses' testimony collectively was overwhelming, especially given their qualifications and the number of doctors permitted to testify resulting in prejudice to her case.

¶ 35    The circuit court did not abuse its discretion when it denied Taylor's motion *in limine* to bar defendants' expert testimony on the basis that the testimony was cumulative. Although Doctors Oddis, Wortmann and Amato testified regarding the standard of care provided by defendants, Doctors Oddis's and Wortmann's speciality was rheumatology whereas Dr. Amato's speciality was neurology. Dr. Block named Dr. Wortmann and Dr. Amato as expert witnesses and Cook County Hospital named Dr. Oddis as an expert witness. The testimony of these doctors collectively was not overwhelmingly prejudicial to Taylor's case.

¶ 36    When multiple defendants are named in a case, each defendant is entitled to present an expert in defense of the case. *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 383 (2000). Two rheumatologists provided expert testimony, but different defendants called these experts as witnesses. Taylor also claims as error the circuit court allowing Dr. Block to testify on his own behalf and stating that the treatment provided to Taylor was within the standard of care for all of defendants. The circuit court did not abuse its discretion in allowing a defendant to testify on his own behalf at trial. If Dr. Block's testimony benefitted the other defendants because he expressed his opinion that Taylor received medical care that complied with the standard of care, the circuit court did not abuse its discretion by admitting the testimony where multiple doctors cared for Taylor.

¶ 37    Dr. Oddis testified at trial on behalf of Cook County Hospital regarding the standard of

care provided by defendant doctors working at the hospital. Dr. Oddis testified that Doctors Manadan, Block and Furmanov complied with the standard of care in 2005 when they treated Taylor, and in starting treatment by prescribing 60 milligrams of prednisone. Dr. Oddis also testified that it was within the standard of care for Doctors Furmanov and Block to transfer Taylor to Oak Forest Hospital. Dr. Oddis further testified that it was within the standard of care for Dr. Furmanov to continue Taylor on 60 milligrams of prednisone and adding 100 milligrams of azathioprine. Regarding the June 10, 2005 visit, Doctors Manadan and Furmanov complied with the standard of care to maintain Taylor on 60 milligrams of prednisone and increase the dosage of azathioprine from 100 to 150 milligrams. Allowing Taylor to go home following the June 10, 2005, visit was also within the standard of care.

¶ 38    During trial, Dr. Wortmann testified as an expert witness on behalf of Dr. Block. Dr. Wortmann testified that Doctors Block's and Furmanov's treatment of Taylor complied with the standard of care. Dr. Wortmann testified that it was within the standard of care for Doctors Block and Furmanov to recommend 60 milligrams of prednisone for Taylor on May 6, 2005. Dr. Wortmann further testified that it was within the standard of care for Dr. Furmanov on May 27, 2005, to continue Taylor on prednisone at a dose of 60 milligrams and adding azathioprine at a dose of 100 milligrams. Dr. Wortmann continued to testify that it was within the standard of care for Dr. Furmanov to allow Taylor to return to Oak Forest Hospital after her clinic visit on May 27, 2005.

¶ 39    Dr. Amato participated in an evidence deposition testifying on Dr. Block's behalf. Dr. Amato specializes in treating patients with myositis. Thus, Dr. Amato stated that he is familiar with the standard of care applicable to a doctor diagnosing and treating a patient with polymyositis. Dr. Amato indicated that based upon his review of all the material and his background, training and experience, Dr. Block complied with the standard of care when he treated Taylor in 2005. According to Dr. Amato, it was within the standard of care for Doctors Block and Furmanov to recommend 60 milligrams of prednisone for Taylor on May 6, 2005. Dr. Amato stated that it was appropriate at the May 27, 2005 clinic visit for Dr. Furmanov to recommend continuing prednisone at 60 milligrams and adding azathioprine. Dr. Amato stated that it was within the standard of care for Dr. Furmanov to have Taylor return to Oak Forest Hospital for continued therapy after the May 27, 2005 clinic visit.

¶ 40    Taylor claims that the above trial testimony in addition to defendants' trial testimony amounted to cumulative testimony because the testimony consistently demonstrated that defendants' actions were within the standard of care to treat an individual with polymyositis, as well as presenting testimony as to causation. Dr. Block was the attending physician who was overseeing Dr. Furmanov, a fellow, in May 2005. Dr. Manadan was the attending physician overseeing Dr. Furmanov in June 2005. Doctors Oddis's and Wortmann's testimony encompasses Doctors Block's, Furmanov's and Manadan's actions regarding compliance with the standard of care. Doctors Wortmann and Amato testified primarily as to Doctors Block's and Furmanov's actions and the applicable standard of care. The testimony, however, was not prejudicial since Doctors Block and Manadan, as attending physicians, supervised Dr. Furmanov. Defendant doctors possess the right to present expert testimony in their defense. Defendant hospital also had the right to call a witness to testify regarding the standard of care in defense of the case. Here, three doctors are named as

defendants, and each defendant doctor has the right to present a defense. *Tsoukas*, 315 Ill. App. 3d at 383. Accordingly, the circuit court did not abuse its discretion in permitting defendants to establish a defense by presenting expert testimony regarding the standard of care applicable in the instant case and as to the issue of causation.

¶ 41        Moreover, Taylor failed to establish an abuse of discretion regarding her claim that an imbalance in the number of experts presented by the defense and her case was prejudicial. Defendants exercised the right to call experts to testify in defense of the case. Taylor, as the sole plaintiff, also had a right to present her case through expert testimony. During the course of the trial, six treating physicians, four expert witnesses, a physical therapist and family members testified on Taylor's behalf. Taylor bears the burden of establishing the standard of care through expert testimony. The circuit court allowed Taylor to call multiple witnesses to meet that burden. No abuse of discretion occurred regarding the admission of expert testimony or the number of witnesses Taylor and defendants were allowed to call to testify at trial.

¶ 42        Taylor's final claim of error is that the circuit court abused its discretion when it allowed Doctors Manadan, Furmanov, Oddis and Wortmann to testify beyond Illinois Supreme Court Rule 213 disclosures. Taylor maintains that the circuit court erred when it allowed the testimony on the basis that the doctors' testimony stated factual information and was not opinion.

¶ 43        Rule 213(f)(3) requires parties to furnish and identify the following:

> "(i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007).

According to Rule 213(g), an expert's opinions at trial are limited to the disclosures provided in a Rule 213(f) interrogatory or during a discovery deposition. Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). Information in an "evidence deposition not previously disclosed in a Rule 213(f) interrogatory answer or in a discovery deposition shall not be admissible upon objection at trial." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). An expert witness may expand upon a disclosed opinion provided that the testimony states a logical corollary to the disclosed opinion and not a new basis for the opinion. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 37 (2010). The circuit court did not abuse its discretion in admitting the testimony of Doctors Manadan, Oddis, Wortmann and Furmanov since it complied with Rule 213's requirements. Each of Taylor's Rule 213 claims of error is discussed below.

¶ 44        During Dr. Manadan's discovery deposition, he stated that approximately 20% to 30% of patients who have polymyositis would have residual weakness even after receiving some treatment. During Dr. Manadan's trial testimony, he testified that 20% to 30% of patients with severe polymyositis may have some decrease in function, but the decrease is not measurable on a strength grade table. The nature of Dr. Manadan's trial testimony did not depart in substance from his discovery deposition as both testimonies identify a percentage of patients who experience residual deficits as a result of the disease. Dr. Manadan recited a factual percentage representing a portion of patients diagnosed with severe polymyositis

who have deficits following treatment. Dr. Manadan's testimony was factual and not an opinion. Thus, the circuit court did not abuse its discretion in overruling Taylor's Rule 213 objection and allowing Dr. Manadan's statements into evidence.

¶ 45    Dr. Oddis's testimony also complied with Rule 213 requirements. During trial, Dr. Block's counsel asked Dr. Oddis the following question: "[B]ased on your experience and the body of knowledge that you're familiar with, what are the expected outcomes for patients with appropriately treated severe polymyositis?" The circuit court allowed the question over Taylor's Rule 213 objection because the answer "would be based on whatever he knows about it." Dr. Oddis responded that based on the literature, "the more severe the onset of disease, the less favorable the outcome." Dr. Oddis then continued to answer questions discussing the mortality rate of patients with severe polymyositis. The Rule 213(f)(3) interrogatories disclosed that Dr. Oddis "will discuss the fact that research and studies of the disease show that certain persons who have the illness do not respond well to any of the recognized therapies and never fully recover from the disease. They require long-term medication and rehabilitation and experience periodic recurrence of the disease." Comparing the answers in the Rule 213 interrogatories with the trial testimony, we conclude that the circuit court did not abuse its discretion in overruling Taylor's Rule 213 objection and allowing the testimony into evidence because the Rule 213 interrogatories disclose that Dr. Oddis would discuss the outcome of patients who do not respond to treatments. Moreover, Dr. Oddis's answer at trial provided facts within his knowledge and was not an opinion.

¶ 46    Taylor also claims that the circuit court erred in admitting Dr. Oddis's trial testimony in which he stated on redirect examination that a rheumatologist is not responsible for recommending the type of therapy that a polymyositis patient needs because a rehabilitation physician having expertise regarding rehabilitation of patients with neuromuscular diseases makes that decision. The circuit court overruled Taylor's Rule 213 objection because Dr. Oddis's testimony provided facts obtained from his experience. During cross-examination at trial, Taylor's counsel asked Dr. Oddis whether a rheumatologist's instructions to a rehabilitation facility "should include guidelines like making sure that the patient was getting physical therapy in terms of range of motion exercises." Dr. Oddis responded in the negative and stated that the rehabilitation specialist and the rheumatologist would advise on the physical therapy regime. Taylor contends that the testimony elicited on redirect examination was erroneously admitted. The question asked of Dr. Oddis was: "[W]ho, according to your understanding, makes the decision on what type of therapy a patient–a polymyositis patient needs?" Dr. Oddis responded: "It's a combined approach. Certainly the rheumatologist does not dictate the type of therapy, because it's the expertise of the rehabilitation physician or the physiatrist as they're called to know how to manage patients that present with all types of neuromuscular diseases." The circuit court did not abuse its discretion in admitting the testimony because Taylor introduced the testimony during cross-examination and Dr. Oddis answered the question presented during redirect examination based upon his experience treating patients. See *Nassar v. County of Cook*, 333 Ill. App. 3d 289, 303-04 (2002) (stating that "[p]laintiffs cannot object where they first elicited the testimony during their examination of [the witness]"). Dr. Oddis was reciting factual information based upon his knowledge and not rendering an opinion. Thus, the circuit court did not abuse its discretion

in overruling the objection because the testimony was not subject to Rule 213. See *id.* at 303 (stating that factual statements are not subject to Rule 213).

¶ 47    Next, Taylor contends that Dr. Wortmann's testimony regarding the length of time it takes polymyositis patients to respond to steroid treatments and when an evaluation should be performed to start second-line drugs exceeded Rule 213 parameters. Taylor claims that the basis for this opinion was not disclosed, lacked foundation and was irrelevant regarding a patient receiving 100 to 120 milligrams of prednisone or IV pulse therapy for three days. During Dr. Wortmann's discovery deposition, he stated that "the drugs work slowly in most people and it usually takes at least four to six, sometimes, weeks to three or four months to see the effects of the medications." During Dr. Wortmann's trial testimony, Taylor's counsel objected to the following question: "[H]ow long based on your background, training, and experience and the literature that you are familiar with does it typically take a polymyositis patient to respond to steroid?" The circuit court overruled Taylor's Rule 213 objection on the basis that Dr. Wortmann's testimony was not an opinion. Dr. Wortmann responded that "it generally takes at least four to eight weeks to discover how well the initial prescription of steroids will work." Also, when asked at trial how long a physician waits before reassessing whether a second agent may be needed, Dr. Wortmann responded that "since we really do not expect to see the maximum benefit from the first agent to as early as–for as long as eight weeks. I would see people generally six weeks after they began their initial therapy to make an assessment." The circuit court overruled Taylor's Rule 213 objection because Dr. Wortmann's testimony was not an opinion since his answer was based upon his experience. The circuit court did not abuse its discretion overruling Taylor's Rule 213 objection. Reviewing Dr. Wortmann's discovery deposition, he discussed the general time period for a patient to respond to steroid treatment. Also, Dr. Wortmann's answer regarding the length of time that must lapse before a reassessment is conducted concerning the medications prescribed to a patient was a fact and not an opinion.

¶ 48    Lastly, Taylor claims that the circuit court abused its discretion when it allowed Dr. Furmanov to testify that Taylor had contractures when she was at Cook County Hospital. During trial, counsel asked Dr. Furmanov whether "Taylor had developed any evidence of contractures during the period of time that you saw her at Cook County Hospital." The circuit court overruled Taylor's Rule 213 objection because the question was seeking what Dr. Furmanov observed or saw. Dr. Furmanov responded that "there was evidence of contractures in Taylor's elbows that he noted upon his initial contact with Taylor." During Dr. Furmanov's discovery deposition, he discussed his clinic note regarding Taylor's May 27, 2005, visit. Counsel asked Dr. Furmanov the following question: "And I noticed that there was some type of contractures in her elbows. Do you know would the 170-degree extension be consistent with the contracture of her elbow?" Dr. Furmanov responded: "The contracture? Something was in the way of the full extension. There was just a little bit, 170, so it wasn't full extension." Since Dr. Furmanov's trial testimony addressed contractures, which was also addressed during his discovery deposition, the circuit court did not abuse its discretion in admitting the testimony as no Rule 213 violation occurred. Moreover, Dr. Furmanov stated factual information based on his observations.

¶ 50    Taylor next claims on appeal that the circuit court abused its discretion when it prevented Taylor from testifying that she would have undergone IV pulse therapy if defendants had presented that option to her. Taylor claims that the failure to inform Taylor of possible treatment options was negligence and not a lack of informed consent. Taylor contends that lack of informed consent cases address a physician's failure to disclose to the patient potential risks, not potential options for care. *Welton v. Ambrose*, 351 Ill. App. 3d 627, 636 (2004). Since negligence was pled in the complaint, Taylor maintains that her testimony was admissible and the circuit court erred in ruling that the testimony related to a lack of informed consent cause of action, which was not pled. Taylor also claims that if the complaint required an amendment to include a lack of informed consent cause of action, then she should have been allowed to amend the complaint because a party may amend pleadings at any time before or after judgment is rendered to conform the pleadings to the proof. 735 ILCS 5/2-616(c) (West 2006).

¶ 51    The circuit court did not abuse its discretion in sustaining defendants' objection barring Taylor's testimony addressing her participation in other treatment options had defendants discussed those options with her. During Dr. Amato's evidence deposition, the following colloquy took place:

"Q. Okay. So you would agree methotrexate was a viable option for Raven Taylor?

A. I think you could discuss that with Raven, the options, and, you know, other side effects of methotrexate.

Q. Doctor, you would agree a reasonable–reasonably well qualified rheumatologist and/or neurologist would be required to go over the reasonable options with a patient such as Raven Taylor in providing treatment?

A. Yes."

During trial, the following colloquy took place between Taylor and counsel:

Q. "Now, Raven, if you would have been told that there were other options for treatment of your case of polymyositis on May 6th up through June 10th, 2005, which included higher doses of prednisone and Solu-Medrol or prednisone, and that you were told you could get–you may be able to get better quicker, but there were risks, the risks that you have heard in court, what would you have done?

Ms. FOLTZ: Objection, Your Honor."

The circuit court sustained the objection finding that: (1) the question was inappropriate since an informed consent cause of action was not pled; (2) assuming an informed consent count was pled, no evidentiary basis to ask the question existed because no expert opined that it was a breach of informed consent or that an injury resulted; and (3) informed consent incorporates an objective standard, not a subjective standard. The circuit court's ruling sustaining the objection was not an abuse of discretion.

¶ 52    Taylor's complaint fails to include a cause of action pleading a lack of informed consent, and allegations of negligence based on the failure to present various treatment options are

also lacking in the complaint. The question posed to Taylor asked what she would have done if doctors had presented to her another treatment option along with the related risks. In essence, the question posed to Taylor was whether she still would have undergone the treatment that she received or if she would have undergone an alternative treatment if the option and risks had been presented to her. The circuit court characterized this question as forming a basis for a lack of informed consent cause of action, which did not amount to an abuse of discretion. To plead a lack of informed consent cause of action, a plaintiff must establish that: "(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment." *Coryell v. Smith*, 274 Ill. App. 3d 543, 546 (1995). "The gravamen in an informed consent case requires the plaintiff to 'point to significant undisclosed information relating to the treatment which would have altered her decision to undergo it.' " *Davis*, 405 Ill. App. 3d at 29 (quoting *Coryell*, 274 Ill. App. 3d at 546).

¶ 53    In a medical malpractice case raising a lack of informed consent count, a plaintiff must prove that a physician "should have informed the patient, prior to administering medical treatment, of the 'diagnosis, the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment.' " (Internal quotation marks omitted.) *Coryell*, 274 Ill. App. 3d at 549 (quoting *Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985)). An informed consent claim employs an objective standard and requires a determination of whether "after proper disclosure, a prudent person would have nonetheless proceeded with the proposed treatment." *Coryell*, 274 Ill. App. 3d at 550. Even assuming defective informed consent, to prevail on an informed consent claim, "plaintiff's resulting condition must have been proximately caused by the absence of informed consent." *Guebard v. Jabaay*, 117 Ill. App. 3d 1, 10 (1983).

¶ 54    Here, the circuit court did not err in holding that the failure to inform a patient of alternative treatments or procedures comprises a lack of informed consent cause of action. The circuit court also did not err in stating what Taylor would or would not have done had she received information about alternative treatments was irrelevant since the standard to base the treatment decision upon is an objective and not a subjective standard. As such, the circuit court did not err in striking the question posed to Taylor concerning disclosure of alternative treatment on the bases that an informed consent cause of action count was (1) not pled in the complaint and (2) Taylor did not present expert testimony supporting the lack of informed consent. Also, the circuit court correctly stated that an objective standard addressing what a reasonable person in Taylor's position would have decided is used and not a subjective standard. *Id.*

¶ 55    Further, the circuit court also did not err in ruling that an amendment to the complaint to include a count for the lack of informed consent was not timely and failed to meet the requirements allowing amendments to a complaint. According to section 2-616 of the Illinois Code of Civil Procedure, which addresses amendments to pleadings:

        "(a) At any time before final judgment amendments may be allowed on just and

reasonable terms, *** changing the cause of action *** in any matter, either of form or substance, in any process, pleading, bill of particulars or proceedings, which may enable the plaintiff to sustain the claim for which it was intended to be brought ***.
***

(c) A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuances that may be just." 735 ILCS 5/2-616 (West 2002).

The four factors to consider whether a pleading may be amended include the following: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). A circuit court's ruling regarding an amendment to a pleading is reviewed for an abuse of discretion. *Id.*

¶ 56    Here, an amendment to the complaint would not cure a defective pleading because Taylor must add a new count to the complaint. The new count relating to the lack of informed consent arose after the trial started and near the close of Taylor's case in chief. The circuit court did not err in stating that adding the new cause of action would result in prejudice to defendants, who did not prepare for that cause of action. Since the amendment was proposed during the trial stage and not during the pleading stage, the circuit court did not abuse its discretion in finding that the proposed amendment was untimely. Accordingly, it was not an abuse of discretion for the circuit court to deny an amendment to the complaint to include a count for the lack of informed consent.

¶ 57    Moreover, the circuit court did not abuse its discretion in precluding Taylor from amending the complaint to address the lack of informed consent because no amendment was necessary to conform the pleadings to the proofs. An amendment to conform the pleadings to the proofs is permissible pursuant to section 2-616(c), but "the proof already produced must support the amendment." *Harding v. Amsted Industries, Inc.*, 276 Ill. App. 3d 483, 494 (1995). When Taylor's counsel asked her whether she would have pursued other treatment options, proof supporting all of the elements for lack of informed consent was not presented. In striking the question asked of Taylor, the circuit court indicated that proofs supporting a lack of informed consent case failed to exist. The circuit court stated that an expert did not testify on Taylor's behalf that the standard of care was breached or that she was injured because she was not given an option to receive 120 milligrams of prednisone or IV pulse therapy. Since proof supporting a claim that defendants were negligent in failing to inform Taylor of treatment options was not presented, the pleadings in this case may not be amended to conform to proofs that were not presented. As such, the circuit court did not abuse its discretion in denying an amendment to the complaint.

¶ 58                    C. Limited Scope of Taylor's Expert Testimony

¶ 59    Taylor's third issue on appeal is whether the circuit court erred in sustaining defendants' Rule 213 objections, thereby limiting the scope of her expert's testimony. Taylor contends

that Dr. Bohan's testimony was either a logical corollary to disclosed opinions or was a disclosed opinion permissible under Rule 213. In connection with this issue, Taylor raises five claims of error.

¶ 60    Taylor's first claim of error relates to Dr. Bohan's testimony addressing Dr. Block's physical examination of Taylor. During trial, the following colloquy took place between Taylor's counsel and Dr. Bohan:

> "Q. And can you tell us, first of all, what joints were examined and whether they appear to be normal or abnormal?
>
> A. Well, it appears that the examination included the shoulder and the elbows and the examination showed decreased range of motion of both shoulders and both elbows.
>
> Q. And what is the significance, if any, to you in your opinion?
>
> MS. FOLTZ: 213, your Honor.
>
> THE COURT: The burden is on you, that is an opinion."

Taylor claims that Dr. Bohan's testimony should have been admitted because it was a logical corollary to his previously disclosed causation opinion. Dr. Bohan's opinion was that defendants' negligence was a proximate cause of Taylor's permanent disability, which included her inability to raise her right arm over her head. Taylor claims she was unduly prejudiced by Dr. Bohan's inability to testify regarding Dr. Block's articular examination.

¶ 61    The circuit court did not abuse its discretion in striking the question posed to Dr. Bohan. Taylor erroneously contends that Dr. Bohan's answer was a logical corollary to an opinion disclosed in his deposition. A witness may elaborate on a previously disclosed opinion provided that "the testimony states logical corollaries to the opinion, rather than new reasons for it." *Lopez v. Northwestern Memorial Hospital*, 375 Ill. App. 3d 637, 645 (2007). Testimony that is a logical corollary to a previously disclosed opinion is admissible and does not violate Rule 213.

¶ 62    Here, Dr. Bohan stated that Dr. Block's examination of Taylor's shoulder and elbows demonstrated a decreased range of motion in both shoulders and elbows. Taylor's counsel then asked Dr. Bohan, "what is the significance, if any, to you in your opinion?" Counsel's question signifies that Dr. Bohan was not testifying relating to matters already disclosed, but, instead, was providing a new basis for his causation opinion. The circuit court did not abuse its discretion in sustaining the objection on the basis that the undisclosed testimony violates Rule 213.

¶ 63    Taylor's second claim is that the circuit court erred when it struck Dr. Bohan's testimony addressing the treatment that Taylor received on May 6, 9 and 10, 2005, and whether that treatment caused Taylor to become refractory to future treatment. During trial, the following colloquy took place:

> "Q. And, Doctor, had the disease gotten under control as you've already testified with the treatment that you testified about, would Raven be normal today?
>
> A. Well, had she been treated properly, I think that much of what happened wouldn't have happened–happened to her wouldn't have happened. First of all, I

-18-

doubt very, very much that her disease would have become refractory to treatment, I think it would have responded. On the muscle biopsy that we–."

The circuit court sustained defendants' Rule 213 objection that followed Dr. Bohan's testimony. Taylor claims that she provided to the circuit court citations to numerous places where Dr. Bohan discussed the correlation between the length of time a patient was untreated or under-treated for an inflammatory disease and likelihood that the patient would become refractory to treatment. Taylor maintains that Dr. Bohan's testimony relates to prior disclosed testimony and the circuit court abused its discretion in sustaining defendants' Rule 213 objection.

¶ 64        The circuit court did not abuse its discretion when it stated that for Dr. Bohan's testimony to be admitted into evidence, his testimony must have related to previously disclosed testimony that during May 6-10, 2005, defendants' care of Taylor caused her illness to become refractory to future treatments. Taylor failed to identify the prior disclosure of such an opinion by Dr. Bohan, and, thus, the testimony was not admissible.

¶ 65        Taylor's third claim of error is that she was prejudiced by the disallowance of Dr. Bohan's testimony addressing a decrease in Taylor's life expectancy. Defense counsel impeached Dr. Bohan's trial testimony in which he stated that Taylor's life expectancy would have been reduced "by less than ten years, maybe seven years, that would be a reasonable estimate." with his prior deposition testimony where he stated that Taylor's life expectancy "would have been reduced by less than ten years had Taylor been treated with an appropriate dose of steroids." On redirect examination, Taylor's counsel was permitted to read the following question and answer from Dr. Bohan's deposition:

> "Q. If the defendants had timely and appropriately treated Raven, and she was on the regime, the medication regime which you have testified to, in your opinion what would her decrease–or would there be a decrease in life expectancy, and what would it be or if there would be?
>
> A. So maybe let's say seven years.
>
> Q. Doctor, is that consistent what the testimony that you told the jury on direct?"

The circuit court sustained defendants' objection as to the form of the question. During the rehabilitation of Dr. Bohan, Taylor's counsel asserted that Dr. Bohan's entire answer was relevant and should have been read to the jury and not just the portion addressing the decrease in life expectancy. The circuit court disagreed and allowed Taylor's counsel to rehabilitate regarding only the reduction in years of Taylor's life expectancy. Taylor maintains that the circuit court abused its discretion by prohibiting the reading into evidence Dr. Bohan's entire answer provided in his deposition.

¶ 66        We disagree with Taylor. The purpose of the rehabilitation was to address Taylor's life expectancy, assuming the doctors had treated Taylor according to the care that Dr. Bohan believed to be the standard of care. Dr. Bohan's complete answer provided during his deposition is as follows:

> "A. I think that if Raven had been treated more aggressively, more timely–and we've gone over that so I'm not going to repeat any of that now–I do think there is a likelihood more likely than not that her disability would be less; that she would

require less medications for maintenance, she probably would require some but probably much less, she probably wouldn't need five drugs; and she might be able to get by with a small dose of prednisone with, say, five and half–five milligrams, seven and a half milligrams, there's a range; and she might have been able to get by just with methotrexate instead of methotrexate and Imuran and Cellcept and Imuran and steroids, higher dose of steroids. If that were the case then one would expect that she would have less complications from less maintenance drugs. Because, again, I think I testified that the mortality would be more likely due to the drugs than to polymyositis itself. And so less drugs, less dosages probably would mean less impact on life expectancy. I think there would still be some impact but probably less than ten years if, in fact, she had been treated appropriately and was in better condition than she is now in terms of her disease state and less disability and less maintenance medications. So maybe let's say seven years."

¶ 67 The circuit court did not abuse its discretion in limiting Dr. Bohan's rehabilitation testimony to address the impact that the doctors' treatment had on Taylor's life expectancy. Defense counsel sought to impeach Dr. Bohan's testimony that Taylor's life expectancy was impacted by 7 years with prior testimony that her life was impacted by 10 years. Thus, for rehabilitation purposes, limiting the prior testimony to address strictly the life expectancy issue was not an abuse of discretion because the additional information in the answer as stated above was not necessary to determine what was Dr. Bohan's prior testimony regarding Taylor's life expectancy.

¶ 68 Taylor's fourth claim of error is that she suffered prejudice when the circuit court did not allow Dr. Bohan to testify on redirect examination regarding the issue of causation and Dr. Manadan's failure to admit Taylor to the hospital on June 10, 2005. During Dr. Bohan's direct examination, the following colloquy took place:

"Q. What injury did they cause?

A. I think that they still had–Dr. Furmanov and Dr. Manadan still had an opportunity even on 6-10 to hit her with Solu-Medrol 1,000 milligrams three times a day and they could have prevented what followed on the next day, on 6-11."

¶ 69 During cross-examination, the following colloquy took place:

"Q. Well, earlier you expressed an opinion that all of that special treatment and necessary treatment could have been avoided had she been hospitalized on June 10th. Wasn't that your testimony?

A. Well, I would amplify that to say–

***

Q. Well, at your deposition, sir, were you asked this question and did you give this answer?

***

Q. So the question was, did it affect the outcome of the severity of her disease from the 10th to the 11th?

And your answer: You know, it probably wouldn't have changed the fact that on

the following day she required all these other measures and deteriorated to the point that she did.

In other words, had they hospitalized her on the 10th, they probably would have still needed to do these other things, and she would have been ventilator dependent and intubated and so forth. One day probably wouldn't have mattered.

Were you asked that question and did you give that answer?

A. Well, like I said, it is a possible. It is possible it wouldn't.'"

¶ 70 During redirect examination, counsel read Dr. Bohan's deposition in which he stated that "Dr. Manadan not admitting the patient on June 10th, 2005 probably didn't cause the intubation and so forth. Do you remember that?" The colloquy below followed:

"Q. Doctor, what does probably mean to you?

A. More likely than not.

Q. And what does could or possibly mean to you?

A. It means it could be, it might happen. It's conceivable that it would. I think that's what I meant by that.

Q. And as far as if Dr. Manadan would have ordered an admission for Raven Taylor on April 10th, 2005-June 10, 2005, what is your opinion in that regard?

MR. BUENGER: Objection to the form of the question.

THE COURT: Sustained. You just do not get rehabilitation–rehabilitation is only to correct a discrepancy. So sustained.

Q. Doctor, if Raven had been hospitalized on May 10th-June 10th, 2005, what would the difference have been to her?

MR. BUENGER: Objection.

THE COURT: This is exactly what I just sustained."

¶ 71 The circuit court did not abuse its discretion in sustaining defendants' objection. On redirect examination, the circuit court allowed Dr. Bohan to define the terms "probably" and "could" or "possibly." The circuit court did not allow counsel on redirect to ask what Dr. Bohan's opinion was regarding hospital admission on April 10 through June 10, 2005. The circuit court did not abuse its discretion when it stated that the purpose of rehabilitation is to correct a discrepancy, and questioning Dr. Bohan on redirect regarding his opinion exceeded the line of questioning permissible to rehabilitate a witness.

¶ 72 Lastly, Taylor claims that the circuit court abused its discretion in sustaining defendants' objection to Dr. Bohan's testimony addressing the information that defendant doctors should have communicated to Oak Forest Hospital following Taylor's transfer on May 10, 2005, and the relevant standard of care. During redirect of Dr. Bohan, the following colloquy occurred:

"Q. And can you tell us in your opinion what the rheumatologists should have told the rehab doctors at the time of transfer on 5-10-05, understanding you do not believe she would have been–she should have been transferred in the first place?

A. Correct.

MS. FOLTZ: Objection, Your Honor. Scope and improper.

-21-

THE COURT: Sustained.

MS. RAYMOND: Your Honor, these questions were asked by Mr. Buenger regarding this specifically.

THE COURT: He was asked questions, but they didn't go to the standard of care. They were factual things, questions. Sustained."

¶ 73    The colloquy during cross-examination between defense counsel and Dr. Bohan was as follows:

"Q. So you believe that because there was not a direct specific instruction, the physicians at Oak Forest would not have known to call rheumatology if they felt there was a concern with Raven?

A. Well, that would be speculation. I cannot get in their minds. I do know that there was–that during the three-week period of time that Raven was at Oak, there was only one communication made in all those three weeks.

What should have been the standard of care is she should have been monitored every day, not one call over a period of three weeks."

¶ 74    Taylor claims that Dr. Bohan's opinion regarding the standard of care concerning a rheumatologist's communication with a rehabilitation facility following a patient's transfer from an acute hospital should have been explored during redirect examination. Taylor maintains that the circuit court sustaining the objection regarding this line of questioning amounted to an abuse of discretion.

¶ 75    The circuit court did not abuse its discretion in sustaining defendants' objection on the basis that the questioning on redirect examination exceeded the scope of the questioning on cross-examination. On cross-examination, Dr. Bohan testified regarding the amount of communication that should have occurred between defendants and Oak Forest Hospital. On redirect, counsel sought to elicit testimony from Dr. Bohan regarding the instructions that a rheumatologist should have provided to the doctors at Oak Forest Hospital. The scope and nature of the information sought to be obtained by the questioning on redirect examination exceeded the nature and scope of the questioning on cross-examination that addressed the amount of communication. Accordingly, the circuit court did not err in sustaining the objection regarding Dr. Bohan's testimony addressing the nature of the communication that was required between the doctors at Cook County Hospital and Oak Forest Hospital.

¶ 76                                    D. Jury Instructions

¶ 77    Next, Taylor claims on appeal that the circuit court erred when it modified IPI Civil (1995) No. 3.01 and IPI Civil (Supp. 2008) No. 3.03. Regarding IPI Civil (1995) No. 3.01, Taylor maintains that the circuit court erred when it refused to instruct the jury that a witness may be impeached by conflicting conduct. Taylor contends that defense experts testified that they have personally treated severe polymyositis cases with the treatment proposed by Taylor's experts. Taylor claims that such testimony conflicted with their standard of care testimony. Because defense experts admitted that they have used the treatment presented by Taylor's experts, Taylor contends the jury should have been instructed to discredit their

-22-

standard of care testimony as it conflicts with conduct that they have previously engaged in when treating patients diagnosed with the same illness.

¶ 78    Regarding IPI Civil (Supp. 2008) No. 3.03, Taylor contends that the circuit court abused its discretion in not reading to the jury the sentence addressing the circuit court's adjustment of the jury's verdict. Taylor claims that because the circuit court did not read the instruction in its entirety, the jury was unaware that the circuit court would address the public aid lien after the verdict. Taylor maintains that the jury "may have refused to find for the Plaintiff reasoning that she was seeking an unjust enrichment–a double recovery." Taylor claims that she was denied her right to have the jury properly instructed by the circuit court's refusal to read IPI Civil (1995) No. 3.01 and IPI Civil (Supp. 2008) No. 3.03 in their entirety.

¶ 79    Jury instructions are "to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Clarke*, 391 Ill. App. 3d 596, 625 (2009). A circuit court "has the discretion to determine if a particular jury instruction is applicable, supported by evidence in the record, and an accurate statement of the law." *Matarese v. Buka*, 386 Ill. App. 3d 176, 178 (2008). A circuit court does not abuse its discretion regarding jury instructions if the instructions in their entirety "fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273-74 (2002). A circuit court is deemed to have abused its discretion regarding faulty jury instructions if the instructions mislead the jury and result in prejudice to the litigant. *Id*. at 274. If a circuit court in its discretion finds that a pattern jury instruction does not accurately state the law, "Supreme Court Rule 451(a) authorizes the trial court to modify it." *Clarke*, 391 Ill. App. 3d at 626.

¶ 80    Turning first to IPI Civil (1995) No. 3.01, Taylor proposed the following jury instruction:

"The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement or acted in a manner inconsistent with the testimony of the witness in this case on a matter material to the issues. Evidence of this kind may be considered by you in connection with all the other facts and circumstances in evidence in deciding the weight to be given to the testimony of that witness."

¶ 81    The circuit court deleted the phrase "or acted in a manner" from the proposed instructions. The circuit court refused to give Taylor's proposed instruction because the evidence did not support that a witness took "an inconsistent position by way of actions." Taylor claims that defense experts' testimony was inconsistent with their conduct in treating patients with severe polymyositis. Reviewing the testimony of Doctors Amato, Oddis and Wortmann, we conclude that the circuit court did not abuse its discretion in modifying IPI Civil (1995) No. 3.01 because the evidence in the record does not support a finding that the experts' testimony was inconsistent with prior conduct. The experts testified that multiple treatment options exist to treat a patient with severe polymyositis and the various options would be considered within the standard of care. Thus, utilizing a particular treatment option previously to treat a patient but recognizing that the treatment provided by defendant doctors was also within the recognized standard of care does not give rise to conflicting conduct.

Accordingly, the circuit court did not abuse its discretion in modifying IPI Civil (1995) No. 3.01 based upon the evidence presented in the instant case, nor is the instruction as modified confusing or misleading.

¶ 82　Turning to IPI Civil (Supp. 2008) No. 3.03, Taylor proposed the following jury instruction:

> "Whether a party is insured or not insured has no bearing on any issue that you must decide. You must refrain from any inference, speculation, or discussion about insurance.
>
> If you find for the plaintiff, you shall not speculate about or consider any possible sources of benefits the plaintiff may have received or might receive. After you have returned your verdict, the court will make whatever adjustments are necessary in this regard."

¶ 83　The circuit court deleted the last sentence from the proposed instruction. In denying Taylor's proposed IPI Civil (Supp. 2008) No. 3.03 instruction, the circuit court stated that it would not give the proposed instruction because "it's a lie" since "no judge adjusts the verdict and the instruction is misleading." According to the circuit court, the instruction "tells the jury it doesn't make a damn bit of difference what you return; if I do not like it, I will make whatever adjustments are necessary, *i.e.*, I will up it or I will lower it if I do not like it." In the circuit court's view, the proposed IPI Civil (Supp. 2008) No. 3.03 would mislead the jury to believe that a verdict awarding damages would be subject to review and modification by the judge. No abuse of discretion occurred here where the circuit court modified an instruction in an effort not to mislead the jury regarding the review of damages, which the circuit court stated in practical terms does not happen. Accordingly, the circuit court did not abuse its discretion in modifying Taylor's proposed IPI Civil (Supp. 2008) No. 3.03 instruction.

¶ 84　　　　　　　　　　　　　　　　　E. Fair Trial

¶ 85　Taylor's last issue on appeal is that she did not receive a fair trial as a result of the circuit court's collective erroneous rulings. Taylor maintains that even if the erroneous rulings individually did not require a new trial, taking the errors collectively deprived Taylor of a fair trial regarding the issues of causation and negligence. Taylor claims that she is entitled to a new trial.

¶ 86　A litigant is entitled to a fair trial, but that right does not encompass an "absolutely error-free trial." *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 559 (1976). A new trial is not warranted if based on the record, the circuit court can determine that no injury to the litigant resulted from any alleged trial errors. *Id.* A new trial, however, may be warranted if the alleged errors affected the outcome of the case. *Simmons v. Garces*, 198 Ill. 2d 541, 566 (2002).

¶ 87　Based on a review of the record, the alleged errors individually and collectively did not preclude Taylor from receiving a fair trial as none of the alleged errors were prejudicial or affected the outcome of Taylor's case.

¶ 88                              IV. CONCLUSION

¶ 89        After reviewing the record, we conclude that the circuit court did not abuse its discretion regarding its evidentiary rulings. The circuit court also did not abuse its discretion in modifying IPI Civil (1995) No. 3.01 and IPI Civil (Supp. 2008) No. 3.03 because it ruled that the proposed instructions would mislead the jury and did not adequately state the law. Taylor also received a fair trial as none of the alleged errors resulted in prejudice or affected the outcome of her case.

¶ 90        Accordingly, the judgment of the circuit court is affirmed.

¶ 91        Affirmed.